Jack SHARP, Jr., Bert Miles, Glen Harris, Jack Long, Jerry Hill and Allen Louvier, Appellees,

v.

251ST STREET LANDFILL, INC., an Oklahoma Corporation, Appellant.

No. 83027.

Supreme Court of Oklahoma.

Oct. 1, 1996.

Steven K. Balman, Bond & Balman, Tulsa, for Appellees.

Michael J. Gibbens, LeAnne Burnett, Crowe & Dunlevy, Oklahoma City, for Appellant.

LAVENDER, Justice.

This is the second time this matter has been before us. In the first appeal we affirmed the decision of the trial court to grant a temporary injunction prohibiting construction and operation of a landfill at a location in Okmulgee County. *Sharp v. 251st Street Landfill, Inc.*, 810 P.2d 1270 (Okla.1991), *overruled on other grounds DuLaney v. Oklahoma State Department of Health,* 868 P.2d 676 (Okla.1993) (*Sharp I* ). The claim for injunctive relief was brought by appellees—either adjacent or nearby landowners—to enjoin construction and operation of the landfill based on an anticipatory nuisance theory which in turn was anchored on the asserted probability ground and/or surface water sources used by them would likely be polluted by operation of the landfill.[1]

After the matter returned to the trial court following the first appeal, appellant, 251st Street Landfill, Inc., made certain changes to its proposed landfill design, which included a leachate [2] collection system and a geomembrane—i.e. plastic—liner, modifications geared toward providing additional protection against the probability of water pollution. The Oklahoma Department of Environmental Quality (DEQ) [3] determined the modifications complied with certain proposed new rules of DEQ concerning solid waste landfills, which determination essentially acted as DEQ's authorization to go forward with construction and operation of the landfill at the designated location. The matter then proceeded to trial. Following trial a decree permanently enjoining con-

---

**1.** Prior to our affirmance of the trial court's grant of a temporary injunction in the earlier appeal [*Sharp v. 251st Street Landfill, Inc.*, 810 P.2d 1270 (Okla.1991), *overruled on other grounds DuLaney v. Oklahoma State Department of Health*, 868 P.2d 676 (Okla.1993) (*Sharp I)*], the Court of Appeals, Division 3, had reversed the granting of the temporary injunction, essentially ruling the matter should have been brought as an appeal from a final decision of an administrative agency pursuant to the Oklahoma Administrative Procedures Act (OAPA), 75 O.S.1981, § 301 et seq., as amended [now 75 O.S.1991, § 250 et seq., as amended], i.e. as an appeal from the decision of the Oklahoma Department of Health to grant a permit to 251st Street Landfill, Inc. to construct and operate a landfill. This Court disagreed, ruling the granting of the permit was not subject to review under the OAPA. Our decision in *Sharp I* was based on our earlier decision in *Stewart v. Rood*, 796 P.2d 321 (Okla. 1990), which had ruled that because judicial review under 75 O.S.1981, § 318 of the OAPA was available only when an opportunity for an individual proceeding was required prior to the granting of such a permit and no statute or constitutional provision mandated an individual proceeding, the OAPA was not implicated. In *DuLaney*, we partially overruled our holdings in *Stewart* and *Sharp I*, determining that a right to an individual proceeding under the OAPA was required in the case of landowners adjacent to a proposed landfill site and mineral interest owners on the site, in part because they had a constitutional right to notice and an opportunity to be heard prior to the granting of such a permit in

that their property rights were potentially subject to injury by operation of the landfill. No party to this appeal currently contends this matter should have proceeded under the OAPA given our earlier decision in *Sharp I* and all appear to concede the matter properly proceeded as an equitable action for an injunction based on an anticipatory nuisance theory.

**2.** Leachate is a contaminate that usually comes from solid waste sites as surface water infiltrates into compacted refuse. *Sharp I, supra,* note 1, 810 P.2d at 1278 n. 9. It is a quantity of liquid that has percolated through a solid and leached out some of its constituents. *Id.* Leachate may contain various pollutants depending on the makeup of the refuse disposed of at a particular site. *Id.*

**3.** The administrative agency initially granting a permit to appellant prior to the *Sharp I* appeal was the Oklahoma Department of Health. The Oklahoma Department of Environmental Quality (DEQ) is the successor to the Oklahoma Department of Health insofar as the regulatory function over solid waste disposal facilities like the proposed landfill at issue here. DEQ was an outgrowth of a major overhaul in the State's environmental laws. *See generally* The Oklahoma Environmental Quality Act, 27A O.S.Supp.1995, § 1–1–101 et seq., as amended; The Oklahoma Environmental Quality Code, 27A O.S.Supp. 1995, § 2–1–101 et seq., as amended; and The Oklahoma Solid Waste Management Act, 27A O.S.Supp.1995, § 2–10–101 et seq., as amended.

struction and operation at the proposed site was entered by the trial court. An appeal by appellant followed and we have retained the matter in this Court.

Two general issues are posed for our review: 1) whether reversible error occurred in the admittance and consideration of testimony from an engineer as expert testimony for appellees and, 2) whether the trial court erred in granting the permanent injunction because his decision was clearly against the weight of the evidence? We hold no reversible error occurred in either acceptance of the expert testimony or in granting the permanent injunction. The decision to permanently enjoin construction and operation of the landfill at the proposed location is, therefore, affirmed.

## I. STANDARD OF REVIEW.

■ The rules governing appellate review in regard to injunctive relief are well settled. The award of a permanent injunction is a matter of equitable concern. *Jackson v. Williams*, 714 P.2d 1017, 1020 (Okla. 1985). Granting or denying injunctive relief is generally within the sound discretion of the trial court and a judgment issuing or refusing to issue an injunction will not be disturbed on appeal unless the lower court has abused its discretion or the decision is clearly against the weight of the evidence. *Johnson v. Ward*, 541 P.2d 182, 188 (Okla. 1975); *See also O'Laughlin v. City of Fort Gibson*, 389 P.2d 506, 509 (Okla.1964) (judgment of trial court in action of equitable cognizance will not be disturbed unless clearly against weight of evidence) and *City of Moore v. Central Oklahoma Master Conservancy Dist.*, 441 P.2d 452, 459 (Okla.1968) (affirmance proper unless judgment clearly against weight of evidence, contrary to law or established principles of equity). In reviewing the matter, we are not bound by the findings or reasoning of a trial court, but we must consider, examine and weigh all the evidence. *Jackson v. Williams, supra,* 714 P.2d at 1020; *Public Service Co. of Oklahoma v. Home Builders Ass'n of Realtors, Inc.*, 554 P.2d 1181, 1184 (Okla.1976); *City of Moore v. Central Oklahoma Master Conservancy Dist., supra,* 441 P.2d at 459. If the

facts and law warrant, however, this Court will affirm the judgment or order of the trial court if the correct ultimate conclusion was reached. *Id.*

■ We must also keep in mind the following principles in our review. An injunction is an extraordinary remedy that should not be lightly granted. *Jackson v. Williams, supra,* 714 P.2d at 1020; *Amoco Production Co. v. Lindley,* 609 P.2d 733, 745 (Okla.1980). Entitlement to injunctive relief must be established in the trial court by clear and convincing evidence and the nature of the complained of injury must not be nominal, theoretical or speculative. *Jackson v. Williams, supra,* 714 P.2d at 1020; *Sunray Oil Co. v. Cortez Oil Co.,* 188 Okla. 690, 112 P.2d 792, 796 (1941). There must be a reasonable probability that the injury sought to be prevented will be done if no injunction is issued—a mere fear or apprehension of injury will not be sufficient. *Id.* Further, the decision of DEQ to grant a permit to appellant to construct and operate the landfill at the proposed site comes with a presumption DEQ has properly carried out its duties and responsibilities under the Oklahoma Solid Waste Management Act, 27A O.S.Supp.1995, § 2–10–101 et seq., as amended. *Sharp I,* 810 P.2d at 1276. However, if it is adequately shown the decision of an administrative agency is inconsistent with legislative intent a court is not bound by such decision and may grant injunctive relief to effectuate the legislative design, assuming, of course, the plaintiff shows entitlement to injunctive relief under traditional equitable principles. *Sharp I,* 810 P.2d at 1275–1276.

■ As to rulings concerning qualifications of expert witnesses and the admissibility of testimony of an expert witness, such matters rest in the discretion of the trial court, and a decision on them will not be disturbed unless it clearly appears that discretion has been abused. *Jones v. Stemco Manufacturing Co., Inc.*, 624 P.2d 1044, 1046 (Okla.1981). With these standards in mind we turn to a review of the issues before us—first the expert witness issue and then the more general one as to whether the trial court erred in permanently enjoining con-

struction and operation of the landfill at the particular location.

## II. ADMITTANCE AND CONSIDERATION OF EXPERT TESTIMONY.

Appellant claims the trial court erred in admitting and considering part of the expert opinion testimony of Richard N. DeVries. It is argued his testimony concerning landfill design should have been disregarded primarily because of the assertion he lacks knowledge and experience to give an expert opinion on landfill design and he was not qualified to express an opinion on the adequacy of the environmental protection systems embodied in the proposed landfill design. We disagree.

12 O.S.1991, § 2702 of the Oklahoma Evidence Code, 12 O.S.1991, § 2101 et seq., as amended, provides that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise." An examination of the record reveals Richard N. DeVries was qualified to give expert opinions concerning landfill design, the probability of the potential for ground and surface water pollution of appellees' water sources from operation of the landfill and, generally, the adequacy of environmental protections of the proposed landfill design at the proposed landfill site.[4]

Richard N. DeVries has both Bachelor and Master of Science Degrees in Civil Engineering from the University of Nebraska. He has a Doctor of Philosophy Degree in Civil Engineering from Utah State University. Dr. DeVries' specialty or discipline within civil engineering is water resource engineering (apparently his Ph.D. work involved this specialty). Water resource engineering includes the study of hydraulics and hydrology. Hydraulics is a branch of science dealing with practical applications, such as the transmission of energy or effect of flow, of liquid—such as water—in motion. WEBSTER'S NEW COLLEGIATE DICTIONARY 555 (1979). Hydrology is a science concerning the properties, distribution and circulation of water on the surface of the land, in the soil, underlying rocks and in the atmosphere. WEBSTER'S NEW COLLEGIATE DICTIONARY 556 (1979). It should also be noted a sub-field of water resource engineering is landfill design.

Dr. DeVries is a registered professional engineer in the states of Oklahoma and Nebraska and a registered land surveyor in the state of Oklahoma. During his education at the University of Nebraska he worked for the City of Lincoln, Nebraska in its engineering department. Upon obtaining his B.S. degree he worked for Northern Natural Gas Company on an underground gas storage project in Redfield, Iowa. He then returned to Lincoln where he managed a sanitary sewer district in Lancaster County, Nebraska. His work there concerned drainage construction in and around Lancaster County.

After receiving his Masters' degree in 1963 he became an assistant professor of civil engineering at the University of Nebraska. In 1969 he became an associate professor of civil engineering at Oklahoma State University. In 1975 he was promoted to full professor, a position which he held for another fourteen (14) years, at which time he retired and took professor emeritus status, a status he maintained at the time of trial. The evidence showed that Dr. DeVries has done consulting work throughout his teaching career, primarily municipal-type engineering and during the six years prior to the trial, environmental-type consulting work.

Dr. DeVries also has considerable experience in the area of remediation of water pollution. He testified to working on a number of cases involving salt water pollution, underground storage tank pollution and oil field pollution. In addition, Dr. DeVries noted during his testimony that leachate collection lines associated with a leachate collection system are similar to sewer lines and that

---

**4.** Some of the following rendition of the qualifications of Richard N. DeVries are taken from the parties' submissions in support of or opposition to a motion in limine filed by appellant prior to trial in an attempt to limit the testimony of Mr. DeVries. The motion in limine, and supporting and opposition materials thereto, have been made part of the record in this appeal.

over his years as a professional engineer he has been involved in building approximately one hundred (100) miles of sewer lines. Dr. DeVries has also had some design experience with geomembrane liners—albeit in oil field mud pit application—although such application is not identical to the landfill context.

In addition, he also has considerable involvement with landfills and landfill design. Although appellant attempts to denigrate this involvement, the record we have been presented shows it cannot be ignored for the purpose of gaging Dr. DeVries' qualifications. First off, an overall review of the record in this case makes it quite clear that Dr. DeVries keeps up with current literature concerning landfills and landfill designs and that he has conducted extensive study in the field. The record also shows Dr. DeVries has engaged in work in regard to at least eight other landfills besides the proposed one at issue here. Two of the eight were hazardous waste landfill projects and the other six municipal solid waste disposal facilities, the type of landfill involved in this case. As to two of these eight landfill projects Dr. DeVries was actually involved in the landfill design phase of the projects (i.e. as opposed to a consultative role either for the proponent or opponents of a particular project)[5], and in one of the two projects either he or his company was engineer of record. Although Dr. DeVries' landfill design in these two projects did not contain the same design features as called for in this proposed landfill—e.g. a geomembrane (or plastic) liner or leachate collection system—as will be seen, such actual hands-on experience with the exact type of landfill design is unnecessary to qualify him as an expert to express opinions on the probabilities the *overall design features of this project at the particular location are insufficient to protect the ground and surface water in the area, e.g. water used by appellees.*

As we set out in **I. STANDARD OF REVIEW,** questions concerning the qualifications of expert witnesses and the admissibility of expert testimony are matters generally within the discretion of the trial court and will not be reversed unless an abuse of discretion is clearly made to appear. *Jones v. Stemco Mfg. Co., Inc.,* 624 P.2d at 1046. This Court also made quite clear long ago that actual hands-on experience in a particular field is not necessary for one to be qualified as an expert in the field, but study alone can be sufficient. *Delaney v. Morris,* 193 Okla. 589, 145 P.2d 936, 939–940 (1944). Section 2702 of the Oklahoma Evidence Code allows one to render an expert opinion in a specialized, technical or scientific area if he or she is qualified by knowledge, skill, experience, training or education. The criteria specified in § 2702 are set out in the disjunctive and qualification may be shown in any one or more of the five ways listed. *Kopf v. Skyrm,* 993 F.2d 374, 377 (4th Cir.1993). "Under Rule 702, a witness may be qualified as an expert by virtue of any one such factor, or upon a combination of any of the five factors." M. GRAHAM, FEDERAL PRACTICE AND PROCEDURE, ch. 8, § 6642, pg. 253 (Interim Edition 1992).[6]

■ Our interpretation of the record is that no abuse of discretion occurred by the trial court's acceptance of the qualifications of Dr. DeVries to give expert opinions in this matter on landfills, landfill design, the potentiality of ground and surface water pollution and generally the adequacy of the environmental protection systems associated with this particular proposed landfill. In our view, he was qualified by virtue of a mixture or combination of the five factors. Clearly, his education and training provide him with the ability to express expert opinion concerning the hydrology of the site and surrounding area. The evidence also shows he has experience in the area of potential pollution of water sources and the causes thereof. As to landfills and landfill design particularly, this

---

5. Apparently a good portion of the consultative work involved hydrological investigation or study, but Dr. DeVries also testified at trial that he previously testified as an expert witness on landfill design in regard to some of the eight projects specified in the text.

6. M. GRAHAM, FEDERAL PRACTICE AND PROCEDURE, is concerned with interpretation of the Federal Rules of Evidence, 28 U.S.C.A. Rules 101 et seq. Our Rule 2702, 12 O.S.1991, § 2702, is the same as Federal Rule of Evidence 702. *See* Evidence Subcommittee's Note to § 2702, OKLA.STAT.ANN. tit. 12, § 2702.

record shows he has acquired knowledge and skill in these areas, some of it by study and some by actual experience. His disqualification in these areas is not warranted simply because he has not actually designed a landfill exactly like the one proposed. *Delaney v. Morris, supra,* 145 P.2d at 939–940. Therefore, we conclude the decisions of the trial court to accept the qualifications of Dr. DeVries as an expert in the areas specified above and, obviously, to rely on those opinions in reaching a decision to enjoin the proposed landfill, did not constitute an abuse of discretion nor do they provide any basis for reversal.

## III. ENTITLEMENT TO PERMANENT INJUNCTION.

When it is clearly made to appear by the evidence that a business cannot be conducted in any manner at the place where situated without constituting a substantial injury to adjoining or nearby property owners a permanent injunction absolutely prohibiting operation of such business at the particular location is appropriate. *Jordan v. Nesmith,* 132 Okla. 226, 269 P. 1096, 1098–1099 (1928); *Kenyon v. Edmundson,* 80 Okla. 3, 193 P. 739 (1920). Further, when a neighboring landowner is confronted with a nuisance and threatened with a complete loss of their water supply, they do not have to wait the actual infliction of such loss, but have a right to apply to a court for injunctive relief. *Baker v. Ellis,* 292 P.2d 1037, 1039 (Okla.1956); *See also McPherson v. First*

*Presbyterian Church,* 120 Okla. 40, 248 P. 561, 566 (1926) (harm suffered must be irreparable in damages and the evidence must be clear and convincing that there is a reasonable probability of injury, not just a mere apprehension). We have also recently recognized that the use and control of fresh water is a matter of *publici juris* and of immediate local, national and international concern. *DuLaney v. Oklahoma State Department of Health, supra,* 868 P.2d at 684. "No commodity affects and concerns the citizens of Oklahoma more than fresh groundwater." *Id.*

In our opinion, if the trial court determined the new or modified safety measures proposed by appellant for the landfill were inadequate to protect against probable pollution of appellees' water sources by operation of the landfill at its proposed location, an appropriate remedy would be a permanent injunction. *Sharp I,* 810 P.2d at 1281–1282. Although the trial court's order granting a permanent injunction was made without specific findings, we must assume the trial court concluded that the additional proposed safety measures are inadequate and that operation of the landfill cannot be conducted at the particular location without the reasonable probability of polluting appellees' water sources. *See Jones v. Novotny,* 352 P.2d 905, 907 *Sixth Syllabus* (Okla.1960) (in case of equitable cognizance the judgment of the trial court carries with it a finding of all facts necessary to support it, which could have been found from the evidence).[7] We do not

---

7. In appellant's first proposition contained in its Brief in Chief submitted in this appeal it is contended the injunction must be reversed because the trial court absolutely prohibited construction and operation of the landfill, rather than limiting the injunction to the aspects he found objectionable. Appellant asserts absolute prohibition was not warranted because the evidence did not show it was impossible to construct and operate the landfill without pollution of appellees' property. Appellant also apparently contends the trial court somehow erred by failing to follow our opinion in *Sharp I, supra,* note 1, because he failed to determine if other measures would provide adequate protection for appellees' water sources. As we noted in the text, we must assume the trial court found the new or modified safety features proposed would not be adequate and that operation of the landfill cannot be conducted at the proposed site without the reason-

able probability of pollution of appellees' water sources. We do not believe the trial court had to go further. Appellant's argument here is essentially based on the theory the design features presently proposed are adequate. That some other non-specified feature or method of protection might exist in the abstract, in our view, does not provide a basis to reverse the trial court's injunction. *See Kenyon v. Edmundson,* 80 Okla. 3, 193 P. 739, 742 (1920) (when owner of business has been given opportunity to show a business can be operated at a particular location in such a manner so as not to create a nuisance and the owner fails to so show, it is not error for trial court to enjoin continuation of business at the location). We add that although some evidence was presented that redundant (i.e. more than one) liner and/or leachate collection systems might provide additional protection to the water sources in the area, as we understand the opin-

find this conclusion clearly against the weight of the evidence.

As we noted in *Sharp I*, the decision of DEQ to authorize construction and operation of the proposed landfill comes to us with a presumption DEQ has adequately carried out its duties and responsibilities under, and has effectuated the purposes behind, the Oklahoma Solid Waste Management Act. 810 P.2d at 1276. Two of these general purposes are protecting the public health, safety and welfare and the environment of this State. 27A O.S.Supp.1995, § 2–10–102.[8] However, as we further recognized in *Sharp I*, if it is adequately shown the permitting of a landfill at a particular location does not effectuate the legislative purposes and a plaintiff shows entitlement to relief under traditional equitable principles, an injunction against operation of a landfill is an appropriate remedy. 810 P.2d at 1275–1276. In our view, the decision of DEQ to authorize this landfill was at odds with the legislative purposes behind the Oklahoma Solid Waste Management Act and it was not error for the trial court to have concluded appellees were entitled to the remedy of an injunction.

The landfill site is the West½ of Section 10, Township 15North, Range 12East, Okmulgee County, Oklahoma. *Sharp I, supra,* 810 P.2d at 1277. About 90 of the 320 acres of the proposed site will be used as cells for the disposal of refuse. *Id.* The landfill was originally permitted under Oklahoma Department of Health regulations as a Type I–B facility, which was generally defined as a metropolitan sanitary landfill serving populations of 30,000 or more which does not accept hazardous waste. *Id.* The majority of waste to be deposited at the proposed landfill will be domestic waste. 810 P.2d at 1278. However, evidence was presented at the temporary injunction hearing [810 P.2d at 1279] and the subsequent trial that domestic waste contains a certain amount of toxic or hazardous household waste. Although screening of the waste will apparently occur, we believe a reasonable conclusion is that a certain amount of toxic materials will find their way into the landfill.

U.S. Highway 75 is a half mile east of the site. 810 P.2d at 1278. Directly north of the site is 251st Street. *Id.* At least some of the appellees have artesian wells on their property.[9] The wells are used for domestic purposes, livestock and agricultural purposes. *Id.* Further, Eagle Creek, a creek running through the landfill site (but apparently not through the cells where waste is to be deposited) also runs through the land of some of the appellees. The creek is used by these appellees either for recreational purposes or watering livestock.

When the matter was initially here in *Sharp I*, it was proposed that the cells where waste was to be deposited were to be lined with a three foot thick clay liner, the then minimum standard required by Oklahoma Department of Health regulations. 810 P.2d at 1278. Subsequent to *Sharp I* appellant modified its design to comply with the "technical" requirements of proposed new DEQ regulations—Municipal Solid Waste Landfill Regulations—and in August 1993 DEQ apparently determined the design modifications were in compliance with the proposed new

---

ion of Dr. DeVries, it is that given current technology in the field of landfill design—coupled with the hydrology at the proposed site and in the area—a landfill cannot be built and operated at the site without posing the reasonable probability the water sources of some of appellees will be polluted by such operation.

8.  When the initial permit was issued in this matter by the Oklahoma Department of Health the purposes of the Oklahoma Solid Waste Management Act were spelled out at 63 O.S.1981, § 2252. Two of the purposes spelled out therein were to prevent water pollution and the creation of nuisances. *Sharp I, supra,* note 1, 810 P.2d at 1273. Although renumbered and amended slightly, these purposes remained when the matter was before us in *Sharp I*. 63 O.S.Supp.1990, § 1–2301.

9.  An artesian well is made by boring into the earth until water is reached which from internal pressure flows up like a fountain. WEBSTER'S NEW COLLEGIATE DICTIONARY 63 (1979). Testimony at the temporary injunction hearing indicated it was a well drilled into the earth's strata until a confined aquifer is encountered and the water confined therein rises above the confining layer. *Sharp I, supra,* note 1, 810 P.2d at 1278 n. 10. As we noted in *Sharp I*, a confined aquifer consists of a permeable zone of the earth's strata containing water which is bounded above and below by strata of low permeability. *Id.*

rules. These DEQ regulations were eventually adopted and became effective in October of 1993. The current rules can be found at Oklahoma Administrative Code (OAC) Title 252, Chapter 510. Refer to 13 Okla.Reg. 1977 et seq. (1996) for the most recent modifications to these rules.

Generally, the design characteristics of the proposed landfill are as follows. First, a compacted clay liner at least 3 feet thick will be placed on a soil base a minimum of two feet above the highest recorded groundwater (i.e. water table) level. A geomembrane liner (some type of flexible, plastic sheeting, designed to be apparently impermeable) will be placed on top of the clay liner. Above the geomembrane liner will be a geotextile liner, a heavy cloth designed to protect the geomembrane liner from puncture. Above these liners will be a leachate collection system, a system of perforated pipes and pumps designed to collect any leachate that might flow through the landfill. On top of the leachate collection system will be a granular drainage blanket comprised of at least one foot of gravel large enough so as not to clog the pipes, but porous enough for the leachate to flow through to the pipes. Finally, the granular drainage blanket will be protected by another foot of additional protective cover, either soil, or clay, or an additional granular blanket. Compacted trash will be placed on top of this, and each days trash will be covered with one-half foot of soil to prevent loose trash from blowing.

The plans also call for monitoring wells around the perimeter of the landfill which are to act as detection devices should any leachate escape the protective devices specified in the above paragraph. The landfill is also to have a system of trenches and berms which will be designed to protect against the possibility of leakage or runoff into Eagle Creek.

Appellees identify two primary mechanisms for potential pollution of their properties—contamination of the confined, artesian aquifer under the site and contamination of

Eagle Creek. To support their case principal reliance was placed on the testimony and opinions of Dr. DeVries, although documentary evidence was also relied on.[10]

First off, there was evidence in the record that showed the site of the proposed landfill overlies a major regional aquifer—the Wewoka Formation or Aquifer. It was Dr. DeVries' opinion that appellees' artesian wells were tapping into the same confined or artesian aquifer as that under the landfill. It was also his view that given the hydrology in the area that the potential existed for pollution of this aquifer. He further expressed the opinion the direction of groundwater flow for this confined aquifer was to the northeast, i.e. from the landfill site toward the artesian wells of appellees.

Furthermore, although the artesian aquifer was in a confined state apparently at least a minimum of sixty (60) feet below the proposed landfill site, Dr. DeVries testified, and other evidence corroborated the fact, that the piezometric or potentiometric surface of the artesian aquifer was actually above ground level at the proposed landfill site. What this means is that because the artesian aquifer is in such a confined—and, thus, pressurized state—it has the potential to rise above the ground when punctured. Thus, a well drilled into this aquifer would flow above the ground like a fountain. Dr. DeVries believed this high piezometric surface of the confined aquifer held the potential for water from the confined aquifer coming up under the liner of the landfill and/or blowing a hole in the landfill's liner system, which he indicated had been detailed in the literature to have previously occurred.

It was also Dr. DeVries' opinion that the water table in the area under the site was a high one, i.e. at certain places under the proposed landfill site it was relatively close to the surface of the ground. His view was because of this state it would be necessary to artificially raise by the use of fill material the surface of the ground at certain places of the

---

**10.** We note that we do not deem it necessary to detail every basis for Dr. DeVries' opinion that the proposed landfill site is an inappropriate site for a solid waste disposal facility or every potential problem he specified for his opinion concerning the probability the water sources of some of appellees would be polluted by operation of the landfill. For the purposes of this opinion we deem it adequate to set out the general bases of his views.

landfill to maintain an adequate minimum distance between the protective layer(s) of the landfill and the water table. He was of the view that because man cannot compact soil as well as nature, settlement of the fill material would occur, which held out the possibility of the sub-base cracking which in turn could cause cracks in the liner system of the landfill—i.e. a potential conduit for pollution. Although there is some dispute over the direction of flow of the water table or unconfined aquifer under the site, Dr. DeVries' opinion was and other evidence appeared to show that, at least, in part it flows north and east, which is toward appellees.[11] Dr. DeVries also held the view that both the confined and unconfined aquifers contributed flow to Eagle Creek.

In addition, certain evidence showed that Eagle Creek, which runs through the site and the land of some of the appellees, generally flows in the direction from the site toward these appellees, i.e. in a northeasterly direction. Evidence also showed that the one hundred (100) year flood plain or boundary was as close as twenty-five (25) to thirty-five (35) feet from the area where trash would be deposited at the landfill site. Dr. DeVries also testified that the drainage area for Eagle Creek includes both the landfill site and the properties of appellees. He also indicated that the landfill site is near the high point of the drainage area and that anything that drains off the site—any pollutant or contaminant—would go downstream toward the lands of appellees.

In view of the matters specified above and other evidence presented, the opinion of Dr. DeVries was essentially that the proposed site for this landfill was not suitable because of the hydrology in the area, and given the state of current technology an environmen-tally safe landfill could not be built at the site. His view was generally that water resources under, in and around the site made the location especially non-conducive to a safe and environmentally sound waste disposal facility. In essence it was his opinion the design of the landfill, including the protective devices to be installed therein, would not be sufficient to protect against pollution of the water resources in the area, but instead a high probability existed that leachate would escape and contaminate the water resources. His ultimate opinion was that there was a very high probability downstream property owners—i.e. at least some of appellees—would suffer both ground and surface water pollution from operation of the landfill. He also noted that it was very difficult to completely remediate such pollution once it occurs, in either the groundwater or surface water systems.[12]

As would be expected, appellant countered the opinions of Dr. DeVries with experts of its own. These experts gave opinions that the protective devices to be installed at the landfill were adequate to protect the water systems in the area and, essentially, there was a negligible possibility of pollution. Evidence was also presented that the landfill would be constructed and operated in compliance with DEQ regulations. There was also evidence presented that at least some of Dr. DeVries' views concerning the hydrology or hydrogeology[13] in the area were incorrect, e.g. the view was presented that the direction of the water flow or movement of the confined aquifer(s) under the landfill site was to the northwest, which would be away from the property of appellees which generally lies north and east of the landfill site.

As pointed out in *Sharp I* [810 P.2d at 1280], *the trial court was not required to*

**11.** *Sharp I, supra*, note 1, previously defined an unconfined aquifer. 810 P.2d at 1279 n. 13. Unlike a confined aquifer it is not bounded above and below by relatively impermeable layers and, consequently, the water confined therein is not in a pressurized state. *Id.* Water from a well drilled into such an aquifer will not rise above the aquifer. An unconfined aquifer is commonly referred to as the water table. *Id.*

**12.** We recognized in *Sharp I, supra*, note 1, that the difficulty, complexity and costliness of reme-

dying groundwater contamination was well documented and that once seriously contaminated groundwater is often rendered unusable and cleaning it up is often unsuccessful. 810 P.2d at 1279 n. 15.

**13.** As we noted in *Sharp I, supra*, note 1 [810 P.2d at 1279 n. 12], hydrogeology is a part of geology that studies the relations of water on or below the surface of the earth.

credit the testimony of the experts presented by appellant over the testimony of appellees' expert. In our view, sufficient evidence was presented to overcome any favorable presumption to be accorded to the decision of DEQ in permitting or authorizing the involved landfill. Based on our review of the record, the decision to permanently enjoin construction and operation of the solid waste disposal facility at its proposed location comported with applicable law and such decision cannot be said to have been clearly against the weight of the evidence. Thus, in this particular case, given the demonstrated sensitivity of the water resources in the area, and the probability operation of the proposed landfill would pollute the water resources of at least some of the appellees, we believe no reversible error occurred by the grant of a permanent injunction.

In sum, we find no reversible error in the trial court's admission of or reliance upon the expert testimony of Dr. DeVries. We also conclude the judgment of the trial court to permanently enjoin construction and operation of the landfill at the particular location should be and is **AFFIRMED.**

WILSON, C.J., KAUGER, V.C.J., and HODGES, LAVENDER, HARGRAVE, OPALA and WATT, JJ., concur.

SUMMERS, J., concurs in judgment.

SIMMS, J., dissent.