2005 OK 88

**Suzanne Leigh BROWN, as mother and next friend of Tucker BROWN, a minor, Plaintiff/Appellee,**

v.

**OKLAHOMA SECONDARY SCHOOL ACTIVITIES ASSOCIATION, Defendant/Appellant.**

**No. 102,816.**

Supreme Court of Oklahoma.

Dec. 8, 2005.

Terry W. West, Bradley C. West, The West Law Firm, Randy C. Parsons, John Cloar, Shawnee, OK, for plaintiff/appellee.

Clyde A. Muchmore, Harvey D. Ellis, Jr., Mark S. Grossman, Crowe & Dunlevy, Oklahoma City, OK, for defendant/appellant.

**PER CURIAM.**

¶ 1 The controlling issue presented by the expedited appeal is whether the trial court abused its discretion in granting a temporary injunction barring the Association from enforcing its decision that Brown not be allowed to participate in upcoming State Championship elimination games. If so, we must vacate the injunction.

¶ 2 The Association's construction of Rule 4(b), Conduct of Students, Rules Governing Interscholastic Activities in Senior High Schools (2005–06),[1] its application and the discipline imposed are reasonable. There is no evidence that the penalty was called in anything other than good faith and in conjunction with the rule of law by a referee who was positioned to see the play and who reacted immediately to the player's action. Therefore, we vacate the injunction.[2]

### FACTS

¶ 3 Shawnee and Booker T. Washington High Schools opposed each other in the Class 5A quarterfinal football playoffs on November 19, 2005. In the last seconds of the game, a referee ejected two players—Brown, who was serving as Shawnee's quarterback, for kicking an opponent and a player on the opposing team for taking a swing at a Shawnee player. The Association construed its rule violation, which was based on the player having engaged in a "fight," to require Brown's suspension in the next two games of the season—the semifinal and, assuming the team's success, the state championship round.[3]

¶ 4 The Association asserts that it is undisputed that Brown kicked an opposing team player in the helmet while the player was on the ground. The Shawnee Head Coach (coach), who happens to be the player's father, conceded that Brown kicked "at" the opposing player.[4] Allegations are that the same player punched Brown in an earlier play without being penalized, but it is admitted that the referee may not have seen the opposing player's actions.[5] The coach also agrees that his son's actions appeared retaliatory and that they fell within the definition of a "fight" under the applicable Association rule.[6] The coach is convinced that the refer-

1. Rule 4(b), Conduct of Students, Rules Governing Interscholastic Activities in Senior High Schools (2005–06), provides in pertinent part:
   "... A student whose flagrant or unsportsmanlike conduct consists of fighting, cursing or using foul language toward a game official will be automatically suspended from participating in a minimum of the next two regularly scheduled games or contests on the same level of competition that his/her team plays.... Fighting is defined, but is not limited to, any player ... striking an opponent with arm(s), leg(s), foot(feet), or other object(s), attempting to strike an opponent with arm(s), leg(s), foot (feet), or other object(s) regardless if there is contact with an opponent ...
   Any substitute or team member who leaves the team bench ... and enters the playing area during a fight or any other serious unsportsmanlike act shall be ejected.... **This rule applies to both regular season and play-off games....The rule would apply to all OSSAA sponsored activities.** Any student involved directly or indirectly for fighting a second time during the season shall be suspended for the remainder of the season." [Emphasis provided.]

2. Title 12 O.S.2001 § 952(b)(2), see note 23, infra.

3. The player from the opposing team was a senior; therefore, the suspension from further participation in two games will be applied to this year's basketball season.

4. Transcript of proceedings, November 23, 2005, Shawnee Head Coach and father of the player testifying in pertinent part at p. 27:
   "... Q Okay, So you disagree that the kick—
   A I agree that he kicked at him, but it was a reaction to an action. I would clarify it as an unsportsmanlike action...."

5. Transcript of proceedings, November 23, 2005, Shawnee Head Coach and father of the player testifying in pertinent part at p. 36:
   "... Q Okay. Would you agree it's possible that the officials did not see the first punch?
   A I would agree here if I wouldn't have seen the video and had a statement from our left tackle that he told him to cut it out.
   Q Well, okay. But you would agree at the time you didn't see it?
   A I didn't see it, no.
   Q And you would agree there are times when officials can't see particular infractions?
   A I would agree, yes...."

6. Transcript of proceedings, November 23, 2005, Shawnee Head Coach and father of the player testifying in pertinent part at p. 29:
   "... Q So would you agree that Tucker attempting to contact the Tulsa Washington play-

ee was pressured and intimidated by the opposing team's coaches into entering the call while, at the same time, the Shawnee coaches were prohibited from taking the field to enter the conversation. The coach acknowledged that the only chance Tulsa had of winning the game in the last seconds was to cause a fumble.[7]

¶ 5 Although agreeing that Brown's actions constituted a violation, the retired commissioner of the Oklahoma Intercollegiate Conference testified that, in his opinion, the calls at the end of the game resulted from poor judgment and common sense.[8] He also believed that the officials were pressed by the Tulsa coaches into making the ejection call.[9]

¶ 6 **The referee responsible for game management,** testifying on behalf of the Association, **stated that he saw Brown kick the other player in his helmet and that when he dropped his flag on the infraction, he knew he had to eject Brown for his actions.**[10] He also testified that neither of the team's two coaches had any influence on the call he made or the sanction imposed[11] and that neither team's coach tried to intimidate him or any of the other referees.[12] In an e-mail report, the referee de-

---

er with his foot would be defined as fighting under this rule?
A Under that rule, yes....
Q So it doesn't make any difference, really, that Tucker was retaliating for an infraction at that particular moment. It would still be defined as fighting; is that right?
A Yes...."

7. Transcript of proceedings, November 23, 2005, Shawnee Head Coach and father of the player testifying in pertinent part at p. 35:
"... Q ... But in that particular circumstance, can you understand that an opposing player, perhaps believing that 'If I can only anticipate this snap count, I might be able to cause a fumble and give us a chance to win the game'?
A Well, how I would do it as a coach is you would go under, you know, get down in the gaps. Diving over the top of the pile is not going to cause a fumble. The play is going to be over by the time you get there. And it was.
Q Well, we can agree that it may have been ill-advised, but you would agree that their only hope at that point would be to try to cause a fumble?
A Yes...."

8. Transcript of proceedings, November 23, 2005, Bill Currens testifying in pertinent part:
at p. 46 "... A ... I think it was one of the worst cases of judgment or common sense that I have ever seen an official do ..."
at p. 54 "... Q An in reviewing the videotape and seeing that Tucker Brown kicked at a Tulsa Washington player, would you agree that in itself would be a violation?
A It is a violation...."

9. Transcript of proceedings, November 23, 2005, Bill Currens testifying in pertinent part at p. 55:
"... And I feel like that they were humiliated by the Tulsa coaches into calling the thing that they did, calling it a double foul...."

10. Transcript of proceedings, November 23, 2005, Steve Wayne Campbell, testifying in pertinent part at pp. 61–2:

"... Q And then what did you observe on that particular play?
A Prior to the snap, the linebacker did jump across the line, in my estimation trying to, you know, anticipate the count and the snap, and he dove across Number 8, the quarterback, was taking a knee. He went down to do this, and the gentleman's hand was on his back, came up across the back of his helmet. Number 8 stood up and at that point, the gentleman that dove across was laying on the ground, and he kicked him in the helmet.
Q So you clearly observed No. 8, Tucker Brown, kick the Tulsa Washington player in the helmet?
A Yes, sir....
Q And in throwing that flag, what was your intent in throwing your flag that we saw in the video?
A My intent from what I saw was I had a personal foul of kicking and I had an ejection at that point. There's no doubt...."

11. Transcript of proceedings, November 23, 2005, Steve Wayne Campbell, testifying in pertinent part at p. 63:

"... Q Did the Tulsa Washington coaches say anything in your hearing to you or any of the other officials?
A The only thing that the Washington coach said to me that I am cognizant, that I remember, is he came up and I had told him that I would take care of things.
And he said, 'Number 8 is ejected too?'
And I said, 'Yes, sir.' And I said, 'I'll take care of the situation.'
Q Now, at the point that that was said to you, had you already made your decision that No. 8 for Shawnee would be ejected?
A Number 8 was ejected before my flag hit the ground...."

12. Transcript of proceedings, November 23, 2005, Steve Wayne Campbell, testifying in pertinent part at p. 64:

"... There was no intent on their part or anybody's part, Shawnee or Washington, to try

scribed the incident to Association headquarters as follows:

> "In tonight's game at Shawnee, between Shawnee and Tulsa Washington we had two ejections:
>
> With 19.4 seconds left in the ballgame Shawnee is leading and has the ball running out the clock. They were taking a knee and just before the snap a Washington player dives over the center and tries to grab the Shawnee quarterback. We have a whistle and a flag but as the Washington player hits the ground the Shawnee QB, Tucker Brown # 8 kicks him in the face. During the next few moments trying to get calm back Tulsa Washington player # 3 swings and hits a Shawnee player. He is also ejected...."

Three video tapes were entered into evidence in the trial court proceedings. All three tapes contained shots of the referee's contested ruling. Although it is impossible to determine whether Brown actually kicked the other player in the helmet or the face, the tapes clearly demonstrate that, immediately following the play, he "kicked" toward another player. The tapes also show the position of the referee close enough to the action to see the play and his immediate throw of the penalty flag.[13] Furthermore, the referee's observations are consistent with those of the umpire who was also close to the play and threw his flag contemporaneously for the same violation.

¶ 7 Shawnee High School representatives protested Brown's suspension before the Association. After meeting with Shawnee's head football coach and Shawnee's athletic director, reviewing videotape of the incident and the written reports from game officials, and interviewing the head referee in charge, the Association upheld the suspension.[14] On November 22, 2005, the player's mother, as his next friend, filed a petition for a temporary and permanent injunction. Although Shawnee's head football coach appeared as a witness for the player, no official representatives of the Shawnee High School joined in the injunction proceedings. A hearing was held in the matter on November 23rd. At the close of the hearing, the trial judge granted the temporary injunction on grounds that the Tulsa coaches, having approached the referees and having engaged them in conversation, created "an appearance of impropriety."[15]

to intimidate us. It wouldn't do any good. The decision had been made...."

**13.** The tapes were viewed for their factual content. Pursuant to *Morrison v. Roberts*, 1938 OK 458, ¶¶ 7–8, 82 P.2d 1023, this Court will not review a particular referee's call with final authority to make the ruling. Rule 14, Football Championship, Rules Governing Interscholastic Activities In Senior High Schools (2005–06), provides in plain, clear, unambiguous, unmistakable and mandatory language that the official's decision "shall be final in play-off games as well as regular season". Therefore, it is not within our province to act as "super referees" to alter or overturn the referee's determinations. Neither may we, because a referee does not make a call, do so for the official—we may not "call the game" or construe the official's failure to see every infraction as arbitrary.

Rule 14, Football Championship, Rules Governing Interscholastic Activities In Senior High Schools (2005–06), § 9 provides:

> "Officials: The game officials in all elimination games shall be selected and assigned by the Board of Directors. Beginning a game with an official constitutes agreement. The official's decision shall be final in play-off games as well as regular season. In elimination games of eleven-man football, five officials

shall be used and their fees are to be determined by the Board of Directors."

The use of "shall" can be permissive. *Cox v. State ex rel. Oklahoma Dept. of Human Servc.*, 2004 OK 17, ¶ 21, 87 P.3d 607; *Minie v. Hudson*, 1997 OK 26, ¶ 7, 934 P.2d 1082; *Texaco, Inc. v. City of Oklahoma City*, 1980 OK 169, ¶ 9, 619 P.2d 869. Nevertheless, the general rule is that the term signifies a command. *United States through Farmers Home Admin. v. Hobbs*, 1996 OK 77, ¶ 7, 921 P.2d 338; *State ex rel. Macy v. Freeman*, 1991 OK 59, ¶ 8, 814 P.2d 147; *Forest Oil Corp. v. Corporation Comm'n*, 1990 OK 58, ¶ 26, 807 P.2d 774.

**14.** The player does not allege that there were any irregularities in the Association's review process. The Association also requested additional reports from game officials on the possibility that they might have been pressured by the Tulsa Washington coaches. None of the reports indicate that the officials' calls were unduly influenced.

**15.** Transcript of proceedings, November 23, 2005, the court providing in pertinent part at pp. 93–4:

> "... It seemed to me, as I saw this, that the great impropriety I saw was the opposing coaches on the field during the period of time that everything was trying to be sorted out...."

¶ 8 On November 28, 2005, the Association filed its petition along with a motion to retain and to expedite the appeal. The following day, an order issued granting both motions and directing that the briefing cycle be completed with the filing of the player's answer brief no later than December 5th.

## DISCUSSION

### ¶ 9 a. Standard of review applicable to Association and to injunctive proceeding.

¶ 10 The Association is made up of schools who voluntarily apply for membership.[16] One of its purposes is to promote high standards of good sportsmanship.[17] With member input, the Association adopts rules governing the interaction between the Association and the membership.[18] Member schools are presumed to acquiesce in the rules and in the constitutional provision vesting final authority as to whether a rule violation occurs in the Board of Directors.[19] Regarding judicial interference with a voluntary association, we have long abided by the general rule that the courts should not intervene except to ascertain whether association proceedings are conducted pursuant to the rules and laws of the organization, in good faith and lawfully. Absent fraudulent, collusive, unreasonable, arbitrary or capricious behavior, this Court may not overturn a voluntary association's enforcement of its rules.[20] We may not interject ourselves in the Association's internal affairs if the rules are reasonable, lawful, in keeping with public policy, and are interpreted fairly and reasonably and enforced uniformly and not arbitrarily.[21]

---

And you—I don't quarrel with the statement that Mr. Campbell made that he didn't see or hear anything there, but the appearance of impropriety is greater than the impropriety itself, and I'm persuaded that that shouldn't have happened.

And it is for that reason that I'm not going to say—I saw plenty of plays and thought about them, but for that reason, the injunction will—the temporary injunction will issue...."

**16.** Association Const. art. III—Requirements for Membership, § 1 provides in pertinent part:

"a. Membership in the Association shall be open to public schools ...

b. Any secondary school desiring to become a member of the Association is to file with the Executive Secretary a resolution ..."

*Mahan v. Agee*, 1982 OK 116, ¶ 2, 652 P.2d 765.

**17.** Association Const. art. II—Purposes, § 2a provides in pertinent part:

"More specifically, the objectives of the Association include:

a. The promotion of important educational and cultural values ... including high standards of good sportsmanship ..."

**18.** Association Const. art. VII—Amendments, § 2—Submitting of Changes in the Rules provides in pertinent part:

"Amendments in the Rules of the Association shall require a majority vote of the member schools voting by mail ballot. Any proposed amendment to the Rules must be submitted by the Board of Directors or by petition signed by at least twenty member schools in writing to the Executive Secretary...."

*Mahan v. Agee*, see note 16, supra.

**19.** *Morrison v. Roberts,* see note 13 at ¶ 5, supra. Association Const. art. IV, § 4—Duties and Powers of the Board of Directors, provides in pertinent part:

"... g. The Board shall have the authority to interpret the provisions of the Constitution and the Rules of this Association, as well as the Policies and Procedures adopted by the Board, investigate alleged violations and shall be the final judge as to whether a violation has occurred...."

**20.** *Mahan v. Agee*, see note 16, supra; *Oklahoma Secondary School Activities Ass'n v. Midget*, 1972 OK 154, ¶ 9, 505 P.2d 175 [Original opinion and opinion on rehearing.]; *Manuel v. Oklahoma City University*, 1992 OK CIV APP 73, ¶ 19, 833 P.2d 288; *Mozingo v. Oklahoma Secondary School Activities Ass'n*, 1978 OK CIV APP 8, ¶ 5, 575 P.2d 1379.

**21.** *Mahan v. Agee*, see note 16, supra [Injunctive relief not warranted where Association enforced rules regarding eligibility for participation in track.]; *Board of Regents of the University of Oklahoma v. National Collegiate Athletic Ass'n*, 1977 OK 17, ¶ 12, 561 P.2d 499, 85 A.L.R.3d 953 [National Collegiate Athletic Association's bylaw limiting the number of assistant coaches was not an unreasonable restraint of trade.]; *Oklahoma Secondary School Activities Ass'n v. Midget*, see note 20, supra [Injunctive relief not warranted where Association enforced rules regarding ineligibility for participation in football game.]; *Morrison v. Roberts*, see note 13, supra [Writ of mandamus refused where Association enforced rule against accepting an award valuing only a few dollars.]; *Mozingo v. Oklahoma Secondary School Activities Ass'n,* see note 20, supra [Association's enforcement of rules concerning eligibility of football players did not warrant granting of temporary injunction.].

¶ 11 The standard of review imposed for the issuance of a temporary injunction is whether the trial court abused its discretion or entered a decision against the evidence.[22] Pursuant to 12 O.S.2001 § 952(b)(2),[23] we may reverse, vacate or modify a judgment of the district court where, on review it appears from the nature of the case and all the facts properly before the Court, the plaintiff was not entitled to injunctive relief.[24] Injunction proceedings are equitable in nature. Therefore, we consider all the evidence on appeal.[25]

¶ 12 **b. The Association's construction of Rule 4, Conduct of Students, Rules Governing Interscholastic Activities in Senior High Schools (2005–06), its application and the discipline imposed are reasonable. There is no evidence that the penalty was called in anything other than good faith and in conjunction with the rule of law by a referee who was positioned to see the play and who reacted immediately to the player's action.**

¶ 13 Rule 4(b), Conduct of Students, Rules Governing Interscholastic Activities in Senior High Schools (2005–06), provides in pertinent part:

"... A student whose flagrant or unsportsmanlike conduct consists of fighting, cursing or using foul language toward a game official will be automatically suspended from participating in a minimum of the next two regularly scheduled games or contests on the same level of competition that his/her team plays.... **Fighting is defined, but is not limited to, any player ...** striking an opponent with arm(s), leg(s), foot(feet), or other object(s), **attempting to strike an opponent with arm(s), leg(s), foot(feet), or other object(s) regardless if there is contact with an opponent ...**

Any substitute or team member who leaves the team bench ... and enters the playing area during a fight or any other serious unsportsmanlike act shall be ejected.... **This rule applies to both regular season and play-off games....The rule would apply to all OSSAA sponsored activities.** Any student involved directly or indirectly for fighting a second time during the season shall be suspended for the remainder of the season." [Emphasis provided.]

The Association's Football Handbook states that the "fighting rule" requires the automatic suspension from participation in "a minimum of the next two games or contests that his/her team plays." [26]

¶ 14 The player asserts that the Association acted arbitrarily, unreasonably and without authority in applying Rule 4(b) to a playoff game. Brown contends that if any

---

**22.** *Sharp v. 251st St. Landfill, Inc.,* 1996 OK 109, ¶ 4, 925 P.2d 546; *State ex rel. Schulte v. Hallco Environmental, Inc.,* 1994 OK 138, ¶ 2, 886 P.2d 994; *Board of Regents of the University of Oklahoma v. National Collegiate Athletic Ass'n,* see note 21, supra.

**23.** Title 12 O.S.2001 § 952(b)(2) provides in pertinent part:
"(b) The Supreme Court may reverse, vacate or modify any of the following orders of the district court, or a judge thereof:
(2) An order that ... grants, refuses, vacates, modifies or refuses to vacate or modify an injunction; grants or refuses a new trial; or vacates or refuses to vacate a final judgment ..."

**24.** *Board of Regents of the University of Oklahoma v. National Collegiate Athletic Ass'n,* see note 21, supra; *Quaker Oil & Gas Co. v. Jane Oil & Gas Co.,* 1917 OK 192, ¶ 0, 164 P. 671.

**25.** *Board of Regents of the University of Oklahoma v. National Collegiate Athletic Ass'n,* see note 21, supra; *Vickers v. Vining,* 1969 OK 66, ¶ 0, 452 P.2d 798. The player makes inconsistent arguments. First, he approaches the district court for judicial relief on the facts and the law's application thereto—arguing judicial review is authorized. On appeal, he is emphatic that the facts and the law support the imposition of the temporary injunction but contends that this Court may not reach the "merits". Rather, he insists that the trial court should do so at the hearing on entrance of a permanent injunction. It is difficult to understand how, under the player's theory, we can address the "merits" of the temporary injunctive proceeding without impacting the result which may be reached when, and if, the trial court proceeds to hold a hearing on a permanent injunction.

**26.** Art. XII, § B, Football Handbook, Oklahoma Secondary School Activities Association (2005–06).

penalty is imposed, it must be done so during the regular season—here, in the first two games of the 2006 season. He insists that the emphasized language above is clearly only applicable to individuals who enter the fray from the sidelines. The Association argues that it is reasonable, considering the rule's language, to apply the two-game suspension penalty in the playoff rounds. We agree.[27]

■ ¶ 15 The player would have us evaluate the rule in light of the rules of statutory construction. Although those rules might provide some insight to intent, the Association need not construe its constitution, rules or handbooks in a technical manner in order to avoid judicial interference. Rather, the Association has discretion in construing its rules and determining their applicability.[28] All that is required of the Association is that its rules be reasonable, lawful, in keeping with public policy, and interpreted fairly and reasonably and enforced uniformly and not arbitrarily.[29]

¶ 16 The Association construed Rule 4 consistent with the language utilized in the Football Handbook finding that Brown should be suspended from participation in the elimination contests. While the rule states that it is applicable to "the next two regularly scheduled games or contests," it also contains language providing that "(T)his rule applies to both regular season and play-off games" and that it encompasses "all OSSAA sponsored activities." Teams who make it to the playoff rounds extend their regular season to the last elimination game played.[30]

¶ 17 Other than the placement of these statements, there is nothing indicating that the rule against fighting was intended to affect only a portion of the proscribed activities encompassed within Rule 4. It is just as reasonable to construe the reference to "this rule" as affecting the entire content of the rule, especially when the regulation is clearly intended to avoid injuries occurring from fighting or other unsportsmanlike conduct.

¶ 18 In both the original opinion and the opinion on denial of rehearing in *Oklahoma Secondary School Activities Ass'n v. Midget,* 1972 OK 154, 505 P.2d 175, we refused to interfere in matters involving the Association's decision declaring an athlete (who happened to be from the same high school as the opponents here) ineligible to participate in the football playoffs and requiring the forfeiture of previously played regular season games in which the athlete participated. The facts here and in *Midget* are strikingly similar. In neither cause did the high school seek relief nor was there any evidence to indicate fraud, collusion, or action by the Association that could be found to be unreasonable, arbitrary, or capricious. Furthermore, each case involved behavior clearly prohibited by the Association rules—here, there is an admission that the player "kicked at" his opponent's helmet. Unquestionably, Rule 4 proscribes such actions, even if there is no contact.

■ ¶ 19 The Association's construction of Rule 4(b), Conduct of Students, Rules Governing Interscholastic Activities in Senior High Schools (2005–06), its application and the discipline imposed are reasonable.

---

**27.** The Association asserts that this argument was not made before them at the time of review. However, although we have reports from the Association and the player on what transpired during Association proceedings, we have no record from which to determine whether such an argument was advanced. Therefore, considering the necessity of a full, fair and speedy resolution of this cause, we address the issue on the assumption that it is necessary for resolution of this appeal.

**28.** *Morrison v. Roberts,* see note 13 at ¶ 5, supra.

**29.** *Mahan v. Agee,* see note 16, supra; *Board of Regents of the University of Oklahoma v. National Collegiate Athletic Ass'n,* see note 21, supra; *Oklahoma Secondary School Activities Ass'n v.*

*Midget,* see note 20, supra; *Morrison v. Roberts,* see note 13, supra; *Mozingo v. Oklahoma Secondary School Activities Ass'n,* see note 20, supra

**30.** Rule 15—Beginning and Ending of Sport Seasons for High School and Junior High, Rules Governing Interscholastic Activities in Senior High Schools (2005–2006), § 1(b) provides in pertinent part:

"The football season for member schools, school personnel, and players shall close on Saturday of week 18, excepting for those teams having elimination games following that date, the season shall close with their last elimination game...."

There is no evidence that the discipline was entered in anything other than good faith and in conjunction with the rule of law by a referee who was positioned to see the play and who reacted immediately to the player's action. Without such evidence, the award of injunctive relief constituted an abuse of discretion. We determine that the player has not shown entitlement to an injunction and the trial court's order is vacated.

¶ 20 Likewise, two other assertions made by the player are unconvincing. Brown argues that, although his school may be a voluntary member of the Association, he is not and that he has some right or entitlement to be deemed "eligible" to participate in interscholastic athletics. The argument is unconvincing under this Court's pronouncement in *Morrison v. Roberts,* 1938 OK 458, 82 P.2d 1023, in which a football player's one year suspension from play by the Association was upheld. The *Morrison* Court addressed the rights of the player stating:

"The plaintiff has many rights as a citizen and as a high school student, but he has no vested right in 'eligibility' as dealt with at such great length in the rules of the Oklahoma High School Association. The defendant board of control was clothed with ample authority to so construe, apply, and enforce this rule, with its specific provision for 'ineligibility' for one year."

Although the *Morrison* opinion issued in 1938, the rule announced regarding rights versus eligibility, in relation to amateur athletics, continues to be recognized as the law of the land.[31] Furthermore, there is nothing inequitable in the application of what is clearly recognized as a rule under which the contest was governed, especially where the Shawnee head coach undeniably advised his players of the conduct expected under Association rules.[32]

■ ¶ 21 Finally, the player contends that the Association acted arbitrarily and capriciously in postponing the semifinal and championship contests after the entrance of the temporary injunction. It does so by relying, first, on language in Rule 14—Football Championship, Conduct of Students, Rules Governing Interscholastic Activities in Senior High Schools (2005–06), § 8 providing:

"Forfeited and Postponed Games: Any game in which an ineligible student is used will be forfeited (see Forfeiture Policy) and if an ineligible student is used in an elimination game, the team will be eliminated. A scheduled game that is cancelled will be forfeited. Games which are postponed due to some urgent emergency must be played not later than Monday of the next week. A postponed final game may be played any day of the following week."

Rather than applying to the Association's actions, the Rule clearly relates to decisions of the schools who may decide to postpone or cancel a game. If you accept the player's reasoning, the Association would have authority, through cancellation or the postponing of a game, to affect the outcome of the

---

**31.** *Oldfield v. Athletic Congress,* 779 F.2d 505, 507 (9th Cir.1985) [Athlete who participated in 1972 Olympic Games and later signed a professional performance contract lacked private right of action to challenge his disqualification from further participation in amateur athletics.]; *DeFrantz v. United States Olympic Committee,* 492 F.Supp. 1181, 1194 (D.C.1980), *affirmed,* 226 U.S.App.D.C. 210, 701 F.2d 221 (1980) [Olympic Committee had authority to decide not to send a team to the summer Olympics and Committee's decision was not state action and did not give rise to an actionable claim for infringement of constitutional rights.]; *Florida High School Athletic Ass'n v. Melbourne Central Catholic High School,* 867 So.2d 1281, 1287 (Fla.App.2004) [No constitutional violation occurs when an athletic association denies a high school athlete eligibility—the opportunity to participate in interscholastic athletic activities is not a constitutionally protected right.].

**32.** Transcript of proceedings, November 23, 2005, Shawnee Head Coach and father of the player testifying in pertinent part at p. 31:

"... Q Is it your understanding that as head coach for an OSSAA member school, that you are responsible for informing your players about what the game rules are and what conduct rules are?
A Yes.
Q And have you tried to do that as head coach?
A We do that frequently, yes....
Q And this year, also, you have reminded players about what the conduct rules are and what the potential consequences are; is that right?
A Yes...."

championship proceedings. Clearly, the options under the rule give the member schools some discretion in determining whether a game should be cancelled—in which the cancelling team would forfeit the game, or postponing a championship round with the understanding that the game be played in the upcoming week.

¶ 22 Second, the player focuses on language of Rule 12—Local Responsibility, Conduct of Students, Rules Governing Interscholastic Activities in Senior High Schools (2005–06), § 3(d) providing:

> "If a student, who has been declared ineligible, is permitted to participate in interscholastic competition because of a court order and/or injunction against the school or OSSAA and if such restraining order and/or injunction subsequently is voluntarily vacated, stayed, reversed, or finally determined by the courts not to justify injunctive relief, one or more of the penalties outlined in Section 1(d) above may be taken in the interest of restitution and fairness to other member schools."

The player's contention that the rule mandates that the Association allow games to go forward when an injunction is in place, is not supported by the rule's language. There is no directive in the rule that states that the Association must allow the series to continue, it merely provides for the repercussions which will ensue "if" [33] the contests are played before a final ruling on the injunctive relief issue. In this instance, where there remain four teams which may be impacted if the championship rounds are allowed to be played, the Association's decision to postpone games rather than to leave the championship subject to challenge should Shawnee win both the semi-final and championship games, while utilizing a potentially ineligible player, seems equitable and just—after all, if Shawnee wins both games without Brown, they will be the undisputed State Champions.

Under the same scenario, if Brown were allowed to participate, three other schools would be left arguing as to who should be the overall winner.

## CONCLUSION

¶ 23 We cannot, under these facts, interfere with the internal affairs of a voluntary membership association. It would be inconsistent to determine that the Shawnee School District, which entered into a voluntary agreement to be bound by Association rules and recognizing the finality of the Association's decisions, could seek judicial relief when the Association has not acted unreasonably or arbitrarily.[34]

¶ 24 The trial court appropriately examined the Association's rules and regulations and the manner in which they were enforced.[35] Nevertheless, under the facts presented, it was an abuse of discretion to intrude into the internal affairs of the Association. The Association promulgates rules which may be amended by those schools who have voluntarily joined its ranks. One of those rules provides for the ejection and suspension of a player from two contests who engages in a "fight." Brown's act of "kicking" in the direction of his opponent falls within the definition of fighting within the rule's language.[36] Because the Association's construction of Rule 4(b), Conduct of Students, Rules Governing Interscholastic Activities in Senior High Schools (2005–06),[37] its application and the discipline imposed are reasonable and there is no evidence that the discipline was entered in anything other than good faith and in conjunction with the rule of law by a referee who was positioned to see the play and who reacted immediately to the player's action, we hold that the injunction should be vacated. Rehearing time is shortened and any petition for rehearing

**33.** The term "if" is considered permissive. See, *Schafer v. Roberts*, 166 Mo.App. 68, 148 S.W. 393–94 (1912).

**34.** *Raines v. Independent School Dist. No. 6 of Craig County*, 1990 OK 68, ¶ 1, 796 P.2d 303; *Oklahoma Secondary School Activities Ass'n v. Midget*, see note 20, supra.

**35.** *Id.*

**36.** Rule 4(b), Conduct of Students, Rules Governing Interscholastic Activities in Senior High Schools (2005–06), see note 1, supra.

**37.** *Id.*

shall be filed not later than 12:00 noon, December 9, 2005.

**REVERSED; INJUNCTION VACATED.**

WATT, C.J., WINCHESTER, V.C.J., LAVENDER, OPALA, KAUGER, EDMONDSON, TAYLOR, COLBERT, JJ., concur.

HARGRAVE, J., dissents.