15 P.3d 8 (2000)
2000 OK CIV APP 130
In the Matter of B.C., an alleged deprived child.
State of Oklahoma, Appellee,
v.
Deborah C., Appellant.
No. 94,369.
Court of Civil Appeals of Oklahoma, Division No. 4.
October 31, 2000.
Sean Burrage, Brad Mallett, Taylor, Burrage, Foster, Mallett & Downs Claremore, Oklahoma, for the Child.
Dawn M. Williams, Tulsa, Oklahoma, for Appellant.
Released for Publication by Order of the Court of Civil Appeals of Oklahoma, Division No. 4.
*10 REIF, J.
¶ 1 This appeal arises from a proceeding that culminated in a judgment entered February 3, 2000, terminating the parental rights of Deborah C. to her minor daughter B.C. The proceeding was initiated on December 15, 1999, by a motion filed by the court-appointed attorney for B.C. The motion alleged circumstances to show Mother's incarceration was detrimental to B.C. as set forth in 10 O.S. Supp.1999 § 7006-1.1(A)(12). Mother's responsive pleadings  a "Statement of Case" and "Trial Brief"  did not deny any of the allegations in the motion to terminate. Instead, Mother's "Statement of Case" alleged that she (1) "began the various requirements of the treatment plan and continued working on this plan until her incarceration on the drug-related charges," and (2) "does not wish to have her parental rights [to B.C.] terminated." The State of Oklahoma "joined" the motion to terminate and listed witnesses who would testify that "mother failed to correct conditions that led to the [deprived] adjudication [of B.C.]." However, the only ground for termination that the jury was instructed to determine was whether Mother's incarceration had a detrimental effect on B.C., as provided in § 7006-1.1(A)(12). The jury returned a verdict that this ground for termination was proven by clear and convincing evidence.
¶ 2 Mother's petition-in-error and brief-in-chief challenge the judgment and verdict for termination on various grounds. First, the Summary of Case portion of Mother's petition-in-error alleges that "the verdict reached by the jury was not supported by the evidence." This identical allegation is reasserted in the Summary of Record portion of Mother's brief. Although not specifically identified as a proposition of error in either the petition-in-error or brief-in-chief, we understand that Mother seeks reversal of the judgment of termination on this ground.
¶ 3 Next, Mother's first briefed proposition stresses that Oklahoma law recognizes that her parental relationship with B.C. is a fundamental right and there is a strong policy to protect this right by a court-prescribed plan to reunite a parent with an adjudicated child. Mother believes that both her fundamental right and the public policy of reunification were violated in this proceeding. She contends that she was "neither judicially advised of the requirements of the prescribed treatment plan nor was she given reasonably adequate time to complete the plan's provisions." (Emphasis omitted.) She basically argues *11 that her incarceration should not be the basis for termination until the State affords her a post-release chance at reunification.
¶ 4 Mother also asserts that she was denied due process by the trial court in (1) allowing counsel for the State and counsel for B.C. to jointly prosecute the motion to terminate and, at the same time, allowing them separate participation in opening and closing argument, voir dire, jury challenges, and examination/ cross-examination of witnesses; (2) allowing counsel for the State and counsel for B.C. to seek termination when B.C. had not been in foster care for fifteen months; and (3) allowing witnesses of the Department of Human Services (D.H.S.) to give prejudicial testimony and make prejudicial statements in the presence of the jury. For the reasons that follow, we reject Mother's propositions of error and affirm the trial court.

I.
¶ 5 We will first address Mother's general challenge that "the verdict reached by the jury was not supported by the evidence." Even though Mother has not briefed this issue, this court has reviewed the record to ensure that there is sufficient evidence to support the verdict. We have independently examined the evidence in view of the serious consequences of terminating Mother's parental rights to B.C.
¶ 6 In addressing this challenge, we first observe that termination of parental rights under § 7006-1.1(A)(12) must be supported by clear and convincing evidence of the following factors:
1. The child has been adjudicated deprived.
2. Custody of the child has been placed outside the home of a natural or adoptive parent, guardian or extended family member.
3. The parent whose rights are sought to be terminated has been incarcerated.
4. The continuation of parental rights would result in harm to the child considering:
 the duration of incarceration and its detrimental effect on the parent-child relationship;
 any previous incarcerations;
 any history of criminal behavior;
 the age of the child;
 evidence of abuse or neglect of the child or siblings of the child by the parent;
 current relationship between the parent and child;
 the manner in which the parent exercised parental rights and duties in the past.
5. Termination of parental rights would be in the best interests of the child.
¶ 7 In reviewing Mother's challenge to the sufficiency of the evidence to establish the foregoing, we are guided by the following standard of review: "In a termination proceeding tried to a jury, the verdict of the jury is conclusive as to all disputed facts, and where there is any competent evidence reasonably tending to support the verdict, [an appellate court] will not disturb the judgment based on that verdict." In re K.L.H., 1993 OK CIV APP 127, ¶ 22, 858 P.2d 1296, 1299 (citing In re T.R.W., 1985 OK 99, ¶ 13, 722 P.2d 1197, 1200).
¶ 8 As concerns the first factor, there was no dispute that B.C. and her older sister, C.D., were adjudicated deprived on February 3, 1999. At the time of the deprived adjudication B.C. was nine and C.D. was fifteen and one-half. There was also no dispute that the reason the children were adjudicated deprived was Mother's possession and use of drugs in the home.
¶ 9 Mother was arrested on October 30, 1998, after marijuana, amphetamine, and various pills were found in the home by police during the execution of a search warrant. The search warrant was issued after C.D. told her school counselor and a Claremore police officer that Mother was using drugs in the home. A caseworker for D.H.S. testified that her office had received a referral a week earlier on October 22, 1998, concerning Mother's drug use and neglect of the children.
¶ 10 After Mother's arrest, both children told the caseworker that Mother used drugs in the home and B.C. told the caseworker she had seen Mother "shooting up." One of the *12 officers who executed the search warrant testified that Mother admitted she used drugs in the home and allowed others to bring drugs to the home and use drugs in the home.
¶ 11 Concerning the second factor, there was no dispute that B.C. had been placed outside the home of her natural or adoptive parents and extended family members since the deprived adjudication. There was no issue about a guardianship of B.C. Between Mother's arrest and the adjudication, B.C. did reside with Mother's sister at Mother's request. However, this was terminated when Mother's sister and her husband were arrested for possessing drugs. B.C. was placed in a foster home on January 20, 1999. Both a caseworker and B.C.'s foster mother testified that B.C. was well adjusted to and thriving in the foster placement.
¶ 12 In addressing the third factor, there was no dispute that Mother was incarcerated at the time the motion to terminate was filed on December 15, 1999. Mother was in custody of the Oklahoma Department of Corrections at the time the motion was filed and at the time of the termination hearing in late January of 2000. Mother had been previously sentenced to four years imprisonment on September 3, 1999. Mother testified that she was scheduled for release in June of 2000. Mother also testified that she had taken advantage of various programs during her imprisonment to overcome her drug problem and to better provide for B.C. upon release.
¶ 13 As for the fourth factor, and the specific considerations bearing on the fourth factor, we first note that the duration of Mother's incarceration was going to extend at least nine months from September of 1999 to June of 2000. While this is not in and of itself a particularly long period of time, the jury could conclude that it would be detrimental to B.C. when considered with the fact that Mother was previously incarcerated for drug offenses in Arizona during 1994 and 1995. In other words, before B.C. had reached her tenth birthday, Mother's criminal behavior involving the use of illegal drugs caused B.C. to be separated from Mother for significant periods of time. During the first period of separation, B.C. came to depend on her older sister C.D. to be her primary care giver. C.D. testified that she was primarily responsible for taking care of B.C. even when they were living with Mother, due to Mother's employment, neglect and drug use. We note that Mother gave a contrary account of her care and parenting of B.C. and C.D. However, the jury had the responsibility to judge the credibility of C.D. and Mother, and to resolve the conflict in their testimony. It appears that they chose to believe C.D. In addition, B.C.'s caseworker, therapist, and CASA worker also believed that C.D. was B.C.'s primary care giver based on statements made by B.C. to them.
¶ 14 Another matter that the jury was to consider in deciding whether continuing Mother's parental rights would result in harm to B.C. was their current relationship. The record reflects that Mother's visitation with B.C. was terminated in April of 1999, after Mother told B.C. that Mother believed that C.D. was filled with enough anger to do something like the Columbine High School shootings. Thereafter, Mother and B.C. maintained a relationship by letters. B.C.'s therapist testified that B.C. shared with her the letters that Mother had written to B.C. The therapist further testified that B.C. felt like the love and concern that Mother expressed in the letters did not sound like her mother. The therapist also gave her opinion that Mother's letters were self-centered on Mother's needs and circumstances. Perhaps the most telltale evidence of the state of the relationship between B.C. and Mother was the therapist's testimony that B.C. had decided that she did not want to return to Mother. The therapist related that B.C. had informed Mother of this decision in letters B.C. had written to Mother.
¶ 15 B.C. also communicated her desire not to return to Mother to her court-appointed attorney, her D.H.S. caseworker, her CASA worker, and her foster mother. The caseworker also testified that B.C. "doesn't trust her mother and she doesn't feel like she has a close relationship with her mother."
¶ 16 Concerning the manner in which Mother had exercised parental responsibility in the past, we again note a sharp conflict in *13 the testimony given by Mother and C.D. We believe it is reasonably clear that the jury believed C.D.'s testimony that Mother largely neglected her parental responsibilities toward B.C. The record also reflects that Mother did not pay any child support after B.C. was adjudicated. Mother was free on bond from roughly January 1999 to September 15, 1999, and was employed during this time.
¶ 17 Finally, there was more than sufficient evidence to support the conclusion that termination of Mother's parental rights was in the best interests of B.C. In reaching this conclusion, we note that it has been held there is "no requirement for expert testimony to prove the best interests of the children" and a jury may base its resolution of this issue on "the opinion of [a] social worker" and "other evidence which would [allow] them to make an informed determination on the question of whether termination was in the best interest of the children." In re K.L.H., 1993 OK CIV APP 127 at ¶¶ 19-20, 858 P.2d at 1299.
¶ 18 B.C.'s therapist testified that B.C. is aware her mother is a "drug addict" and that "drugs are her problem." The therapist further testified that B.C. has had this awareness "as long as [B.C.] can recall." In the same vein, the D.H.S. caseworker testified that B.C. had stated she believed "nothing will help her mother and her mother will just do it again." As noted, the caseworker related that B.C. "doesn't trust her mother" as a result of her past drug use and incarcerations.
¶ 19 The caseworker further related that B.C. had been telling her since March of 1999 that she did not want to return to Mother. The therapist who had seen B.C. weekly since August 16, 1999, testified that "from the very beginning [B.C.] was very clear with me that she did not want to [return to her mother]." B.C.'s foster mother similarly testified that B.C. "wants to be adopted and [is] really afraid that she's going to end up having to go back . . . to her mom."
¶ 20 When asked why there was a change from a goal of reunification to termination, the D.H.S. caseworker explained:
Well, there were several reasons. First of all [B.C.] does not want to return to her mother and it appears that it is not in her best interest to do so. She is afraid that when she goes back to her mother that first of all she won't be taken care of. She's also upset that her sister will not be returning back with her mother and her sister was her main care giver. She's also angry with her mother for giving up her sister. She is afraid that if she upsets her mother the same thing will happen to her and 
¶ 21 The caseworker also testified about B.C. being "scared" because "[s]he doesn't know what's going to happen to her." The caseworker described this uncertainty as "damaging" because B.C. was not living in "a stable situation" pending Mother's incarceration. The caseworker favored termination because B.C. "should not have to wait around and that she deserved to be in a permanent home."
¶ 22 We would further specially note the testimony of B.C.'s therapist about the anxiety, manipulative behavior, pseudo-maturity, and perfectionist/blame-shifting traits that B.C. had developed. The therapist described these as typical survival traits that deprived children develop. When asked what chances B.C. would have removing these problems if Mother's parental rights are not terminated, the therapist replied: "Next to none. It would be very difficult."
¶ 23 Under the record presented, we find that the jury could reasonably conclude there was clear and convincing evidence that termination was warranted under § 7006-1.1(A)(12) and that it was in the best interest of B.C. for Mother's parental rights to be terminated.

II.
¶ 24 While this court agrees that Mother has correctly stated the law concerning her parental relationship and the policy of reunification, we do not find that the State or counsel for the child did anything in derogation of Mother's rights or the policy of reunification. By the enactment of § 7006-1.1(A)(12), the legislature has recognized that *14 the incarceration of a parent of a deprived child can have a detrimental effect on the child, and that such detriment can be an independent basis for termination. There is nothing in § 7006-1.1(A)(12) to indicate that any specific period of time must pass for foster care or for completion of a treatment plan before the State or counsel for the child can pursue termination on this ground.
¶ 25 The fact that Mother made the treatment plan an issue in this case does not mean that it placed any additional burden on either the State or counsel for B.C. Neither the State nor counsel for B.C. sought to base termination on non-compliance with the plan vis-à-vis failure to correct deprived conditions. Mother was allowed to testify about her efforts to comply with the treatment plan, and the State and counsel for B.C. were allowed to inquire about her lack of compliance, for the purpose of determining whether Mother's incarceration was having a detrimental effect on B.C. and the parent-child relationship. The fact that the treatment plan may not have been judicially prescribed had no bearing on the limited purpose for which the evidence of compliance or non-compliance was offered. Lack of a judicially prescribed treatment plan is certainly no impediment to the termination of parental rights under § 7006-1.1(A)(12) where the conditions of that statute are proven.
¶ 26 In reviewing the record, we fail to find support for Mother's contentions that her parental rights were terminated for failure to comply with a treatment plan that lacked judicial approval, or on account of her incarceration alone.

III.
¶ 27 Mother bases her due process challenge to the dual advocacy by counsel for the State and counsel for B.C. on decisions by the court of criminal appeals. In particular, she relies on the court of criminal appeals' prohibition of "two-against-one" advocacy by a prosecutor and counsel for the children in a criminal case. She cites Gregg v. State, 1992 OK CR 82, ¶ 6, 844 P.2d 867, 881, which discusses in its order denying motion for rehearing the "two-against-one" prohibition set forth in Conner v. State, 1992 OK CR 68, 839 P.2d 1378. Mother also cites the rule in Driskell v. State, 1983 OK CR 22, 659 P.2d 343, prohibiting "special prosecutors." We observe that the issues of "two-against-one" and "special prosecutor" advocacy by counsel for a child have been most recently addressed by the court of criminal appeals in Cooper v. State, 1996 OK CR 38, 922 P.2d 1217.
¶ 28 The chief problem that we see with applying the "two-against-one" and "special prosecutor" prohibitions of criminal law to civil termination proceedings is that the role of court-appointed counsel for children in criminal cases is defined and limited by a specific statute applicable only to criminal prosecutions. In Cooper, the court of criminal appeals interpreted the criminal statute to mean an advocate for the child victim may only participate in the criminal trial "when such participation promotes the best interest of the child." Id. at ¶ 6, 922 P.2d at 1218. In addition, the court of criminal appeals "caution[ed] against allowing the child advocate to participate in those phases of the trial other than those specified in [the statute]." Id. at ¶ 8, 922 P.2d at 1218. The court concluded by saying that it was "participation in any other capacity than that specified in the statute [that] puts appointed counsel in the role of `special prosecutor' which is specifically prohibited by Oklahoma law." Id. (citations omitted).
¶ 29 Simply put, a deprived/termination proceeding is not a criminal prosecution and the legislature has not given counsel for a child in a deprived/termination proceeding the same limited role that it has given the court-appointed advocate in the criminal cases. Indeed, counsel for a deprived child is expressly authorized to file a petition for termination. 10 O.S. Supp.1999 § 7003-8.4(B)(1). In addition, counsel for a deprived child can independently prosecute the termination proceeding, if the district attorney elects not to join in the termination. We note that the instant case is not the type of case that the district attorney is required to join, as provided in 10 O.S. Supp.1999 § 7003-4.7.
*15 ¶ 30 Mother stresses, however, that the district attorney did elect to join the motion for termination filed by counsel for B.C. Mother argues that the interests of the State thereby became aligned, if not united, with the interests pursued by counsel for B.C. In essence, Mother contends that the "two-against-one" and "special prosecutor" rules should apply to termination proceedings in such circumstances, due to the punitive effect that a judgment of termination has on the parental rights. Mother believes, at the very least, that counsel for the child and counsel for the State should not each be accorded three peremptory challenges to prospective jurors when the State "joins" a motion to terminate filed by counsel for the child.
¶ 31 As counsel for B.C. points out, Mother's challenge to allowing peremptory challenges to both the child and the State in a termination proceeding was rejected long ago in In re T.R.W., 1985 OK 99, ¶¶ 6-11, 722 P.2d 1197, 1199-1200. In addition, we believe that the holding in T.R.W. that there are "three distinct interests" in a termination proceeding  those of the parent, the child, and the State  remains a viable rule, despite subsequent statutory revisions that allow counsel for a deprived child to prosecute termination proceedings and authorize a district attorney "to join" such proceedings on behalf of the State. In a few words, the concepts found in Oklahoma's criminal law and procedure prohibiting "two-against-one" advocacy and private counsel serving as a "special prosecutor" simply do not apply to civil proceedings for termination of parental rights.

IV.
¶ 32 Mother also argues that the termination proceeding was premature and a denial of due process because B.C. had not been in foster care for fifteen of the past twenty-two months. Mother relies on 10 O.S. Supp.1999 § 7003-4.7 to support this proposition.
¶ 33 In rejecting this proposition, this court first observes that section 7003-4.7(A)(1) is a directive to district attorneys to initiate or to join a pending proceeding for termination in cases where "[t]he child has been placed in foster care by the Department of Human Services for fifteen (15) of the most recent twenty-two (22) months." We would further observe that a child's placement in foster care for fifteen of the most recent twenty-two months is also made a ground for termination of parental rights by section 7006-1.1(A)(15). Nothing in either section 7003-4.7 or section 7006-1.1(A)(15) indicates that the legislature intended to prescribe a fifteen-month period of foster care that must be completed before termination can be pursued. In fact, this court has determined that the "plain purpose" of section 7006-1.1(A)(15) and a related statute making it retroactive "is to protect children from extended foster care." In re M.C., 1999 OK CIV APP 128, ¶ 6, 993 P.2d 137, 139.
¶ 34 As previously noted in this opinion, section 7006-1.1(A)(12) is an independent ground for termination and nothing in this section indicates that any specific period of time must pass for foster care or for completion of a treatment plan before termination can be pursued on this ground. Accordingly, we hold that prosecution of this termination proceeding about one year after the deprived adjudication was neither "premature" nor a denial of due process.

V.
¶ 35 Mother also contends that there were two instances in the course of the trial in which prejudicial matters were presented to the jury and which justify the grant of a new trial. Mother alleges that the trial court permitted a witness to give an expert opinion about B.C.'s artwork after declining to recognize the witness as an expert. Mother also complains about prejudicial remarks by another witness in the presence of the jury. Our examination of the record fails to support Mother's contention that any prejudicial error occurred in either instance.
¶ 36 As far as the testimony about B.C.'s artwork is concerned, the record reflects that the trial court allowed the witness, B.C.'s CASA worker, to testify to matters within her expertise and experience using art therapy to assess the feelings of children. Mother's primary complaint to this testimony *16 is that the court declined to inform the jury that the witness was an expert in art therapy. We conclude that the trial court's reluctance to expressly acknowledge the witness as an "expert" did not affect either the admissibility or probative value of the testimony. Such express recognition is not required by 12 O.S.1991 § 2702. It is well settled that "[w]here a witness discloses sufficient knowledge to qualify . . . as an expert, soundness of [her] conclusions pertains to weight of [her] testimony, rather than to its admissibility and is to be determined by the trier of fact." Jordan v. General Motors Corp., 1979 OK 10, ¶ 7, 590 P.2d 193, 195 (footnote omitted). In the instant case, the witness detailed her education, training, and experience using art therapy to assess children's feelings.
¶ 37 The substance of the witness's testimony centered on five pictures drawn by B.C. The witness asked B.C. to draw pictures to express feelings when living with Mother and her feelings after about a year in foster care. The witness explained how she interpreted B.C.'s "before" and "after" feelings. The witness noted that the pictures and her interpretation were not a diagnostic tool, but simply provided a way for a child with limited verbal skills to communicate feelings like sadness, anger, fear, insecurity, deprivation, concern for others' well-being, being happy, and whether needs for love and caring are being met.
¶ 38 As concerns the reliability of the assessment or interpretations of an art therapist, we specially note that the witness was asked whether two art therapists could look at a certain drawing and draw a different conclusion about what that person was feeling. The witness replied, "They [the interpretations of different art therapists] would not be vastly different." An additional indicia of reliability is found in the witness's testimony that children do not possess a sufficient level of sophistication to use the art therapy to lie or be manipulative about their feelings.
¶ 39 This evidence was clearly probative of B.C.'s state of mind at various times that were relevant to determining what course of action would be in B.C.'s best interests. Counsel for B.C. was certainly entitled to prove B.C.'s state of mind to assist the court and jury in determining what course of action would be in B.C.'s best interest. We observe that the witness was familiar with both B.C. and the use of art as a medium of communication for children such as B.C. The witness was subjected to thorough cross-examination concerning art as a medium of communication for children and her interpretations of B.C.'s artwork.
¶ 40 "[R]ulings concerning qualifications of expert witnesses and the admissibility of testimony of an expert witness . . . rest in the discretion of the trial court, and a decision on them will not be disturbed unless it clearly appears that discretion has been abused." Sharp v. 251st Street Landfill, 1996 OK 109, ¶ 6, 925 P.2d 546, 549 (citation omitted). We find no legal error, abuse of discretion, or prejudice in the trial court's admission of the testimony of the witness with expertise in the field of art therapy.
¶ 41 Concerning the alleged prejudicial statements of another witness in the presence of the jury, we note that the record reflects the jury did not hear any of the statements admittedly made by the witness. The court specifically asked the jurors whether they had heard anything about the case in the hallway outside the courtroom or in the courtroom. The court stated for the record that the jurors indicated they had not heard anything that day about the case, either in the courtroom or in the hallway. Regardless of anything the witness may have said, the record reflects the jurors were unaware of any statements by the witness other than the witness's testimony.
¶ 42 In order for such misconduct to be a ground for reversal and new trial, it must affirmatively appear that the misconduct has influenced the jury. Mother has failed to show any specific prejudice or any adverse influence on the jury due to the alleged prejudicial statements.

VI.
¶ 43 The record contains observations by the trial court and Mother's trial counsel that this is the first termination proceeding in the district court of Rogers County that was (1) *17 brought by counsel for a deprived child and (2) based on detriment to a child due to a parent's incarceration, as provided in § 7006-1.1(A)(12). Appellate counsel for Mother makes the same observation in Mother's brief-in-chief. Our review of case law governing termination of parental rights revealed that the appellate courts in Oklahoma have yet to issue a published decision in a case involving termination that was requested by counsel for a deprived child based on § 7006-1.1(A)(12). Despite the novelty of the issues in this case and the lack of guidance on how to proceed, the trial court, counsel for B.C., counsel for the State, and trial counsel for Mother all did a commendable job in the trial of this case. It is regrettable that the trial transcript cannot be produced verbatim in this opinion to guide the trial of like cases in the future.
¶ 44 Having determined that sufficient evidence supports the judgment entered on the jury verdict to terminate the parental rights of Deborah C. to her daughter, B.C., and finding no error, abuse of discretion, or prejudice in the trial of this case, this court affirms the judgment.
¶ 45 AFFIRMED.
¶ 46 GOODMAN, C.J., and STUBBLEFIELD, J., concur.