2008 OK CIV APP 104

**In the Matter of A.K., Alleged Deprived Child.**

**The State of Oklahoma,**
**Petitioner/Appellee,**

v.

**Aftab Ahmed Khan,**
**Respondent/Appellant.**

**No. 105,912.**

Court of Civil Appeals of Oklahoma,
Division No. 3.

Oct. 24, 2008.

Tim Harris, Tanya N. Wilson, District Attorney's Office, Tulsa, OK, for Petitioner/Appellee,

Gwendolyn L. Clegg, Tulsa, OK, for Respondent/Appellant.

Pete Silva, Lara Russell, Public Defender's Office, Tulsa, OK, for A.K.

KENNETH L. BUETTNER, Presiding Judge.

¶ 1 Respondent/Appellant Aftab Ahmed Khan (Father) appeals from a judgment terminating his parental rights to A.K. due to incarceration. We hold that the record does not include clear and convincing evidence supporting termination in this case and reverse.

¶ 2 A.K. was six years old when she and her older half-sister were removed from their mother's home because of physical abuse in September 2005. Petitioner/Appellee State of Oklahoma filed its Petition for deprived adjudication September 30, 2005. The State alleged A.K. was deprived because of physical abuse and domestic violence in the mother's home, and because of abandonment, failure to protect, and failure to support on the part of Father. The Petition included a request for immediate termination of Father's parental rights pursuant to 10 O.S.2001

§ 7006–1.1(A)(2), (3), and (7). The Petition asserted Father's address was unknown.

¶ 3 Hearing on the Petition against Father was held January 18, 2006. Father failed to appear.[1] The trial court found the State had met its burden of proof and terminated Father's parental rights to A.K. in a judgment filed January 24, 2006. An Order filed March 12, 2008 shows that the mother voluntarily relinquished her parental rights to A.K. in a hearing held April 18, 2007.

¶ 4 The State filed a "2nd Amended Petition," making the same deprived allegations against Father and again seeking immediate termination, May 14, 2007.[2] A return of service, showing Father was personally served at the Federal Correction Institution in Forest City, Arkansas, was filed June 11, 2007.

¶ 5 Father filed an Answer June 19, 2007. In his Answer, Father denied having abandoned A.K. Father asserted he has been incarcerated since December 12, 2003 and is scheduled to be released on or about July 1, 2013. Father admitted not paying child support, asserting that in prison he did not earn money with which to pay child support, and asserted he had not willfully abandoned the child. Father stated A.K.'s paternal aunt, living in Broken Arrow, could assume custody of the child and continue to raise her in the Muslim faith. The trial court appointed counsel for Father August 14, 2007.

¶ 6 The State filed a "3rd Amended Petition" February 15, 2008. The State alleged Father was incarcerated for distribution of a controlled dangerous substance. The State again asserted A.K. was deprived due to abandonment, failure to support, and failure to protect by Father. The State requested

immediate termination of Father's parental rights for abandonment, pursuant to 10 O.S. 2001 § 7006–1.1(A)(2) and/or (3); failure to support, § 7006–1.1(A)(7); and for incarceration, § 7006–1.1(A)(12).

¶ 7 Jury trial was held April 14–16, 2008. The State indicated it was proceeding only on § 7006–1.1(A)(12) (incarceration) and the trial court instructed the jury on that ground alone. The jury returned its verdict finding by clear and convincing evidence that Father's parental rights should be terminated on the ground that Father is incarcerated, the continuation of parental rights would result in harm to the child, and that termination was in A.K.'s best interests. The trial court entered its Order terminating parental rights May 1, 2008. Father appeals.

¶ 8 Title 10 O.S.2001 § 7006–1.1(A)(12) provides:

A. Pursuant to the provisions of the Oklahoma Children's Code, the finding that a child is delinquent, in need of supervision or deprived shall not deprive the parents of the child of their parental rights, but a court may terminate the rights of a parent to a child in the following situations; provided, however, the paramount consideration in proceedings concerning termination of parental rights shall be the health, safety or welfare and best interests of the child:

* * *

12. A finding that all of the following exist:

a. the child has been adjudicated deprived, and

b. custody of the child has been placed outside the home of a natural or adoptive

---

1. A DHS caseworker filed a "Publication Investigation" for Father November 1, 2005, listing attempts to locate an address for Father. The information asserted A.K. received a birthday present from Father in October 2005 which indicated Father was in a correctional facility in Arkansas. The worker noted Father was not incarcerated by the Arkansas Department of Corrections. The Affidavit and Application for Publication (notice), filed November 10, 2005, averred that both the Arkansas Department of Corrections and the federal prison in Arkansas had reported not having an inmate by the name of "Aftab Hamet Khan." The trial court authorized notice to Father by publication one time in the Tulsa Daily Commerce & Legal News.

2. The January 2006 judgment was vacated. The 2nd Amended Petition states it was made "to reflect the true and correct name and aliases of Aftab Ahmed, natural father of (A.K.)." The 2nd Amended Petition names Father as "Aftab Ahmed a/k/a Aftab Khan Ahmed, Yousaf Ahmad, and Azmat Hamud." In his Answer, Father denied ever using the names Yousaf Ahmad or Azmat Hamud.

parent, guardian or extended family member, and

c.  the parent whose rights are sought to be terminated has been incarcerated, and

d.  the continuation of parental rights would result in harm to the child based on consideration of the following factors, among others: the duration of incarceration and its detrimental effect on the parent/child relationship; any previous incarcerations; any history of criminal behavior, including crimes against children; the age of the child; the evidence of abuse or neglect of the child or siblings of the child by the parent; and the current relationship between the parent and the child and the manner in which the parent has exercised parental rights and duties in the past, and

e.  termination of parental rights is in the best interests of the child.

Provided, that the incarceration of a parent shall not in and of itself be sufficient to deprive a parent of parental rights(.)

Clear and convincing evidence must support termination of parental rights. *In re S.B.C.*, 2002 OK 83, ¶ 7, 64 P.3d 1080, 1082. In its Answer Brief, the State asserts that we must affirm the jury's decision if it is supported by any evidence, citing *In re T.E.B.*, 2001 OK CIV APP 70, 24 P.3d 900. That standard of review for termination cases was expressly rejected in *S.B.C.*, where the court explained:

We are hence persuaded that, in order to assure faithful nisi prius compliance with the federal mandate, appellate review of a parental-bond severance must be conducted by searching for the presence of clear-and-convincing proof. The heightened test that is accorded fundamental rights would be watered down—if not indeed rendered meaningless—by the use on review of anything less than the very same standard as that which is required in the trial courts. In short, to warrant affirmance of nisi prius findings, appellate review in a parental-bond-severance proceeding must demonstrate the presence of clear-and-convinc-

ing evidence to support the first-instance decision.

64 P.3d 1080 at ¶ 7 (emphasis omitted).

■ ¶ 9 Father asserts that the State failed to meet its burden of proving that his incarceration would result in harm to A.K. as required by § 7006–1.1(A)(12)(d). We agree. The evidence showed that Father went to prison in 2003, when A.K. was four years old, and he would be released in 2013, when she is 14. The evidence did not show a detrimental effect on the parent/child relationship. There was no evidence that Father had any previous incarcerations or any history of criminal behavior. Nor was there evidence Father had committed crimes against children or abused or neglected A.K. or any siblings. The evidence of the current relationship between Father and A.K. showed that Father sends gifts to the child and speaks to her on the phone. The foster mother testified that when the child speaks to Father she asks where he is and when he is coming home. There was no evidence that A.K. was fearful of Father. Father testified that before he was incarcerated, he shared custody of the child with her mother. Father was involved enough in A.K.'s life then that he knew the daycare provider (who is now her foster mother). In this case, the only basis for termination was Father's incarceration, but the statute plainly states that incarceration alone shall not be a basis for termination of parental rights.

¶ 10 We have reviewed the record in its entirety. The caseworker testified that Father was accused of failing to protect A.K. from the mother's abuse, but the evidence was that Father was incarcerated and had no way to protect the child. The caseworker further testified that after the mother relinquished her parental rights, "the plan for (A.K.) change(d) to" adoption. When asked why DHS recommended Father's parental rights be terminated, the caseworker testified:

(b)ecause he has had no contact at all with his child. He has not done anything towards working a treatment plan. I don't believe he's ever been to court. I've never seen him. So he's not done anything to

participate in trying to get his daughter back.

It is unclear from this testimony whether the caseworker was aware Father was in prison. The foster mother and Father both testified that Father had contacts with A.K. Additionally, the Petition against Father did not charge him with failure to correct conditions, and Father did not have a treatment plan, so it is unclear what relevance a treatment plan has to this case. Furthermore, Father was unable to come to court both because he was incarcerated and because the State failed to afford him notice of this case until two years after it began. At that time, Father filed an Answer and sought to preserve his parental rights. The caseworker testified she believed termination was in A.K.'s best interests because the child needs permanency. The child knew the foster mother as her daycare provider before she became her foster mother. The foster mother testified she loves A.K. There is nothing in the record to indicate that A.K. will not remain in the same foster home if Father's parental rights are not terminated. The caseworker testified A.K. had not had any problems as a foster child and she is in a safe and stable home. The caseworker testified that a change in custody when Father is released would be hard for A.K., but she agreed also that DHS would not immediately return the child to Father when he is released because he would have to work a treatment plan and have a job and a home before regaining custody. The caseworker testified that the State sought immediate termination in Father's case because "DHS doesn't feel that a parent in prison could care for a child." This testimony indicates the State's view that incarceration alone is sufficient to terminate, despite the opposite language in the statute.

¶ 11 The DHS adoption specialist testified that A.K. is a happy child who is comfortable in her foster home. She testified she believed termination was in the child's best interests because the child needed the stability of knowing she was adopted and not in foster care. She further testified that A.K. had not suffered any problems due to being in foster care. She noted problems other foster children have experienced during puberty, but she stated her belief A.K. would remain stable as long as she remains with her foster mother. The adoption worker testified A.K. told her she wanted to be adopted, but she also testified that A.K. had expressed a desire to maintain contact with Father.

¶ 12 The foster mother testified that A.K. is a happy, active child who enjoys school and church activities. She testified Father had sent A.K. purses for Christmas and her birthday, and had written to her. She testified Father called A.K. a week before trial, and that he usually called once a month. The foster mother testified that when Father calls, she allows A.K. to talk to him, but she does not make calls to Father for A.K. When asked if the phone calls include anything improper, the foster mother responded "No. The main thing she talks about is where is he and when is he coming home. That's the most (*sic*) thing she wants to know." The foster mother testified she and A.K. sent Father A.K.'s school picture.

¶ 13 Father testified that before his conviction, he owned a gas station in Tulsa and shared care of A.K. with her mother. He testified that he calls A.K. every week and talks to her for 3 to 5 minutes, and that he sends letters and gifts. Father explained his parental rights should not be terminated because "I'm a good father and I love her, and she my (*sic*) blood, and I want to give her what she deserves, a good future, her family, and I never abuse my daughter. I love her. When I was outside, I put her in a private school, . . . ." Father testified he did not want A.K. to know he is in prison and he told her he is out of town working. Father testified that A.K. told him she missed him and wanted to stay with him.

¶ 14 The record presented does not show by clear and convincing evidence that continuation of Father's parental rights would result in harm to A.K. or that termination of Father's rights was in A.K.'s best interests. The child and Father have a parent-child relationship, based on phone calls and letters. The child is in a safe, stable, and loving home with a foster mother she has known since before she was removed from her natural mother's home. Duration of incarceration is

the only factor presented here, and even that was not shown to cause harm in this case.[3]

¶ 15 Because we find the evidence did not meet the required level of proof, we reverse on that basis and we do not review Father's other allegations of error. REVERSED.

MITCHELL, V.C.J., and BELL, J., concur.

---

3. Cases in which incarceration of the parent caused harm to the child show dramatically different facts than those presented here. See *In re C.J.*, 2005 OK CIV APP 66, 121 P.3d 1119, cert. denied; *In re S.L.*, 2003 OK CIV APP 69, 76 P.3d 77; *In re B.C.*, 2000 OK CIV APP 130, 15 P.3d 8.