2014 OK 55

**Debbie ROCA, Plaintiff–Appellant,**

v.

**Carlos ROCA, Defendant–Appellee.**

No. 108190.

Supreme Court of Oklahoma.

June 24, 2014.

As Corrected Sept. 3, 2014.

A. Craig Abrahamson, Tulsa, OK, for the Plaintiff/Appellant Debbie Roca.

William D. Lunn, Tulsa, OK, for the Defendant/Appellee Carlos Roca.

GURICH, J.

### Facts & Procedural History

¶ 1 Debbie Roca, now Debbie Houston, and Carlos Roca were divorced by a consent decree entered on March 12, 1990. The decree of divorce included a child support computation which obligated Roca to pay the sum of $403.70 each month. After ten years of nonpayment Houston cited Roca for contempt, alleging Roca had willfully failed to comply with the decree's child support mandates. A jury found the defendant guilty of indirect civil contempt, and he was sentenced to six months incarceration. Additionally, the trial judge imposed a judgment for past due child support in the amount of $85,392.77. In its September 13, 2000 judgment, the trial court determined that the principal arrearage owed was $55,400.27. This sum was set as the purge amount. Additionally, the judgment imposed statutory interest on the principal arrearage at a rate of ten percent per year. Neither party appealed this ruling.

¶ 2 Following his incarceration, Roca paid $5,000 of the purge fee and was released from custody. The trial court conditioned Roca's release on his payment of $850.00 per month toward current and past due child support beginning October 1, 2000.[1]

¶ 3 Roca made payments for approximately two years, and on April 16, 2003, the trial court entered an order establishing a reduced purge fee of $40,215.87. The parties also entered into an agreed order lowering Roca's monthly child support payment to $193.74 per month. This order became effective May 1, 2003. The trial court lowered the cumulative monthly payment for current and past due child support from $850.00 to $600.00. Additionally, the trial judge required all future payments to be posted through the Oklahoma Centralized Support Registry.[2] The Oklahoma Department of Human Services began administering child support collections for the Roca case in June of 2003. Roca made monthly payments of $600.00 between June 2003 and August 2009.[3] His current monthly child support obligation terminated at the end of May 2005, when the parties' child reached the age of majority.

¶ 4 On August 26, 2009, Roca filed a motion asking the district court to enter an order finding he had satisfied the principal child support arrearage; he further requested termination of the wage assignment. Roca later withdrew the motion and submitted a notice which asserted "all of his court-ordered child support payments" had been paid. The notice acknowledged owing some amount of accrued interest, but maintained that the remainder of his child support obligation had been paid in full. Spreadsheets included in the record reflected child support payments of $52,168.00 were made by Roca between June 2003 and August 2009.[4] Houston filed an objection, claiming for the first time that all of Roca's previous payments should have been applied in the following order: (1) current child support, (2) interest on the judgment, and finally (3) the principal arrearage. According to Houston's calculations, Roca still owed $84,147.26. On September 21, 2009, a default order was entered

---

1. Although there is no order in the record which delineates how payments were to be allocated under this order, pleadings filed by Houston acknowledge the $850.00 sum was payable as the "purge fee." Motion to Accelerate Sentence, O.R. at 5.

2. See 43 O.S.2011 § 413.

3. The record reflects that Roca also made two lump sum payments of $2,600.00 and $5,600.00 in June and July of 2003.

4. Attached to Roca's Motion to Terminate Garnishment was a DHS spreadsheet reflecting the total payments received through the Oklahoma Centralized Support Registry between June 2003 and August 2009.

adopting the figures presented by Houston.[5] Roca sought to vacate the default order, and on November 10, 2009, the trial court sustained Roca's motion to vacate.

¶5 On March 19, 2010, the trial court entered a final order resolving the issues surrounding allocation of payments. After being presented with the respective pleadings on the issue, and arguments from both parties, the trial judge determined: (1) payments applied against the judgment rendered July 11, 2000, should be credited first to current support (including medical expenses and child care), second to unpaid child support arrearages, and third to interest; (2) Roca's current child support obligation terminated at the end of May 2005, when the parties' child reached majority; (3) Roca had paid all sums owed for current and past due child support, excluding interest on the obligation; (4) Roca's remaining obligation was $54,818.77, representing unpaid interest on the child support obligations; (5) $54,818.77 should be set as the new purge fee; and (6) the remaining unpaid liability should not accrue further amounts of interest.

¶6 Houston appealed the lower court's ruling and COCA reversed. COCA concluded that the facts of this case required application of the common law rule also known as the United States Rule. By applying the United States Rule, COCA found that Roca's payments should be credited first to current child support, second to accrued interest, and last to the principal balance of past-due child support. Roca sought review in this Court, and we granted certiorari to resolve this question of first impression.

## Standard of Review

■■ ¶7 Whether monthly payments covering current child support, past-due child support, and accumulated interest should be allocated by applying the United States Rule is solely a legal issue for this Court to resolve. *See generally Phillips v. Hedges*, 2005 OK 77, ¶8, 124 P.3d 227, 230–231. Questions of law mandate application of the de novo standard of review, affording this Court with plenary, independent, and non-deferential authority to examine the issues presented. *Harmon v. Cradduck*, 2012 OK 80, ¶10, 286 P.3d 643, 648.

## *Analysis*

■■ ¶8 The sole issue presented in this case is how payments should be allocated between current child support, accumulated arrearages, and interest on past due amounts. COCA concluded this question was controlled by the United States Rule, thereby requiring Roca's payments applied first to current child support; second, to interest on past due child support; and finally to the principal balance of child support arrearages. Because we find Oklahoma statutes and DHS rules provide the method of allocating and distributing payments in this case, we reverse and hold that the United States Rule does not control this proceeding.

¶9 Deriving from common law, the United States Rule requires "partial payments of a debt be applied first to unpaid interest due and thereafter to the principal debt." 28 Williston on Contracts § 72:20 (4th ed.). Its purpose is to encourage full and prompt payment of indebtedness. *Id.* While the policy rationale behind application of the United States Rule to consumer loans or civil money judgments is sound, we believe COCA erroneously applied it to this child support proceeding. We have previously condoned use of the United States Rule for purposes of allocating payments toward ordinary civil money judgments. *Landess v. State ex rel. Comm'rs of Land Office*, 1958 OK 295, ¶¶10–11, 335 P.2d 1077, 1079. However, we have never been called upon to decide the Rule's

---

**5.** Therein, the trial judge concluded the principal balance owed was still $59,300.45, with accumulated interest of $24,846.81 through September 1, 2009, creating a total judgment of $84,147.26. Roca alleged that the default order was entered following confusion over whether the hearing on his motion to terminate the wage assignment had been cancelled. As noted, Roca filed a pleading subsequent to his motion, styled "Defendant's Notice of Payment of Purge Fee and Withdrawal of Motion to Terminate Garnishment." In spite of Roca's withdrawal of the pending motion, Houston's attorney appeared at the scheduled hearing and secured judgment by default. Houston denied that the hearing was stricken or rendered moot by the filing of the purported notice and withdrawal.

application to a judgment procured from unpaid child support.

¶ 10 There are significant differences between a child support debt and a civil money judgment which require application of distinct allocation principles for payments toward the child support obligations in this case. Oklahoma's legislature has adopted specialized enforcement mechanisms to aid in the collection of child support, as required by Title IV, Part D, of the Federal Social Security Act, as amended, 42 U.S.C., § 651 et seq.[6] These tools include, but are not limited to, revocation or non-issuance of a driver's or professional license (43 O.S.2011 § 139.1); incarceration or fine for indirect contempt of court (21 O.S.2011 § 566); imposition of a statutory lien against real or personal property (43 O.S.2011 § 135); interception of the obligor's tax refund (68 O.S.2011 § 205.2); court ordered bond or other security to ensure compliance with a child support order (43 O.S.2011 § 116); felony prosecution for nonpayment of child support (21 O.S.2011 § 852); and statutory interest of ten percent per annum (43 O.S.Supp.2012 § 114). Each of the aforementioned statutes are designed to facilitate payment of child support and are inapplicable to ordinary money judgments. Child support in this state is controlled by statute; therefore it is unnecessary rely on the common law to assess an obligor's liability.

¶ 11 The unique aspect of a child support collection case sets it apart from actions involving an ordinary civil money judgment. The Supreme Court of West Virginia explained this contrast in a similar case:

[C]hild support payments are a legal duty rather than a debt. Additionally, [Bureau of Child Support Enforcement] maintains that the Legislature's recognition of the fundamental difference between support orders and money judgments in the enactment of remedies conforming with federal requirements for collection of child support ... are significantly different from those available for collection of routine money judgments. The statutes governing interest on support also stand apart from those relating to money judgments.

*Hornbeck v. Caplinger*, 227 W.Va. 611, 712 S.E.2d 779, 783 (2011) (citation omitted). The *Hornbeck* Court was presented with a legal scenario comparable to the one we are asked to decide. *Id.* at 782. In determining how payments toward a child support judgment should be credited, the court weighed administrative rules promulgated by the state's child support enforcement agency. *Id.* at 785–786. Those regulations required payment of sums in excess of current child support obligations to be applied to principal rather than interest. *Id.* Affirming application of these rules, the West Virginia Supreme Court noted the policy rationale behind this method of allocating payments on child support judgments:

BCSE maintains that this procedure is in keeping with the legislative intent that parents have a most serious obligation to provide for the support of the needs of their children. Applying excess payments to child support principal in arrears merely carries out this priority by providing that any available assets go toward tending to the needs of a child over and above payment of interest which would benefit someone other than the child.

*Id.* at 785.

¶ 12 Like West Virginia, Oklahoma has enacted specific statutes which deal with

---

**6.** In an effort to address increasing dependence on federal social services created by unpaid child support obligations, Congress passed legislation in the mid–1970s requiring each state to develop their own child support enforcement program. Laura W. Morgan, *The Federalization Of Child Support A Shift In The Ruling Paradigm: Child Support As Outside The Contours Of "Family Law,"* 16 J. Am. Acad. Matrim. Law. 195, 203; Paul K. Legler, *The Coming Revolution in Child Support Policy: Implications of the 1996 Welfare Act*, 30 Fam., L.Q. 519, 521 (1996). Commonly referred to as a "IV–D" program, these state organizations consisted of a joint state and federal enforcement system. Numerous amendments were made to the original enactment, perhaps none more significant than the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA). The PRWORA ended the federal government's direct involvement with welfare administration and replaced it with a system of block grants to states complying with IV–D program requirements. *Id.* In the area of child support enforcement, the PRWORA compelled changes in state laws and procedures to enhance collections of support. *Id.* One such requirement was the creation of a central support registry. *Id.*

child support obligations. Furthermore, our Legislature has expressly vested DHS, as the state's child support enforcement agency, with the authority to promulgate rules necessary to carry out the requirements imposed by federal law. *See* 56 O.S.2011 § 237(B)(2). In 2000, the Oklahoma Legislature amended 43 O.S. Supp.2000 § 413 (eff. Nov. 1, 2000), adding subsection (F), which read: *"[a]ll payments made through the [Centralized Support] Registry shall be allocated and distributed in accordance with Department of Human Services policy and federal regulations."* [7] (emphasis added). Utilizing its statutory authority, DHS implemented rules which govern the allocation and distribution of child support payments. Because the record indicates Roca began making his payments through the Centralized Support Registry in June of 2003, § 413 required those payments to be accounted for in conformity with DHS policy and federal rules.[8]

¶ 13 At the time Roca began paying child support through the Registry, DHS regulations contained several sections which addressed allocation and distribution of payments received. First, OAC 340:25–5–351 (2003 Supp.) provided that DHS administered support payments · "received by the Centralized Support Registry for IV–D and non-IV-D cases." According to definitions set forth in the rules, a non-IV-D case was defined as a private child support case not receiving IV–D services. *See* OAC 340:25–1–1.1 (2003 Supp.) On the other hand, a IV–D case was one involving benefits paid under Title IV, Part D, of the Social Security Act[9]. *Id.*

■ ¶ 14 After all current child support was paid, the 2003 version of agency rules required DHS to apply "collections under payment plans to fixed monthly past-due support obligations." OAC 340:25–5–351(d).[10] Additionally, payments to interest were controlled by OAC 340:25–5–140.1, which read in part: "(h) CSED applies payments to interest *after* current support and all arrears have been paid in full." [11] (emphasis added). OAC 340:25–5–140.1 contained no limitation on its application, and appears equally relevant to both IV–D and non-IV-D cases. On the other hand, the rules also contain conflicting language, suggesting that in non-IV-D cases with only one family support obligation, "OKDHS pays collections directly to the family without allocating collections to the various types of support obligations." [12] OAC 340:25–5–351(b)(2). To compound the apparent discord, DHS amended their allocation and distribution rules multiple times between 2003 and 2009. These inconsistencies require us to employ rules of construction to determine the objectives of DHS' administrative rules.

7. This section remains identical; however, it is now codified at 43 O.S.2011 § 413(G).

8. Federal regulations only address allocation of payments in IV–D cases. 45 C.F.R. § 302.51, reads in relevant part:

(a)(1) *For purposes of distribution in a IV–D case,* amounts collected, except as provided under paragraphs (a)(3) and (5) of this section, shall be treated first as payment on the required support obligation for the month in which the support was collected and if any amounts are collected which are in excess of such amount, these excess amounts shall be treated as amounts which represent payment on the required support obligation for previous months. (emphasis added).

9. There is nothing in the record to suggest IV–D services were being received by Houston on behalf of the minor child.

10. According to 56 O.S.2001 § 237.7(20) " 'Payment plan' includes, but is not limited to, a plan approved by the support enforcement entity that provides sufficient security to ensure compliance with a support order or that incorporates voluntary or involuntary income assignment or a similar plan for periodic payment of past-due support and, if applicable, current and future support …" Roca was undoubtedly paying the 2000 child support judgment via a payment plan as defined by statute.

11. *See* OAC 340:25–5–351(b)(5).

12. DHS regulations defined support as "all payments or other obligations due and owing to the obligee or person entitled by the obligor under a support order, and may include, but is not limited to, child support, medical insurance or other health benefit plan premiums or payments, child care obligations, support alimony payments, and other obligations as specified in Section 118 of Title 43 of the Oklahoma Statutes." *See* OAC 340:25–1–1.1. It is unclear from the record in this case, whether DHS merely provided a conduit for transferring payments to Houston or whether the agency employed consistent allocation policies for both IV–D and non-IV-D cases.

*Charlson v. State ex rel. Dept. of Public Safety,* 2005 OK 83, ¶ 10, 125 P.3d 672, 675. Amendments to statutes or administrative rules may be used by this Court for the purposes of discerning ambiguities in the original enactment. *See Polymer Fabricating, Inc. v. Emp'rs Workers' Comp. Ass'n,* 1998 OK 113, ¶ 15, 980 P.2d 109, 114 (giving retrospective effect to legislative amendments intended to clarify uncertainties in prior version of statute).

¶ 15 In 2013, DHS amended its rules to clarify agency protocol for allocation and distribution in IV–D and non-IV–D cases. The current version of OAC 340:25–5–351 (eff. July 1, 2013), now provides in part:

Allocation and distribution of collections

..

(c) Allocation.

(1) In general. Allocation refers to how a payment will be divided among obligations. Some obligors have more than one child support case and the rules of allocation determine which case receives all or a portion of the collection received. A collection is allocated based on the source of the collection and the type of legal action resulting in a collection.

(2) Allocation models. OCSS divides collections among the obligor's eligible obligations based on the following models:

(A) Standard Model. All payments not made by income withholding order or federal income tax refund offset are allocated to eligible obligations in the following sequence:

(i) *prorated to the current child support,* cash medical support, and spousal support;

(ii) *prorated to the monthly payment plan on past support;* and

(iii) amounts remaining from the initial collection or additional collections received during the same month will allocate based on a prorated share of total arrears owed on all eligible obligations. The allocated amounts cannot exceed the total arrears due on the cases.

(B) Income Withholding (IWO) Model. Periodic payments from an income withholding order are allocated to eligible obligations in the following sequence:

(i) *prorated to the current child support,* cash medical support, and spousal support;

(ii) *prorated to the monthly payment plan on past support* and other judgment(s), such as judgments for attorney fees or genetic testing costs; and

(iii) the steps in (1) and (2) of this subsection are repeated for amounts remaining from the initial collection or additional collections received during the same month, until the entire collection is allocated.

..

(4) Non–Title IV–D cases. In non-Title IV–D cases, OCSS allocates payments as follows:

(A) payments received from an income withholding order are allocated using the IWO Model above. Collections are allocated to non-Title IV–D cases based on the amounts listed in the non-Title IV–D IWO;

(B) all other payments are allocated using the Standard Model above. When OCSS receives information on processing a specific payment, OCSS may allocate the payment based on that information.

d) Distribution.

..

(5) *OCSS distributes payments to interest owed after the current child support and principal arrears balances are paid in full* to each obligation. (emphasis added).[13]

¶ 16 The amended version of OAC 340:25–5–351 leaves no doubt that DHS allocates payments uniformly, regardless of a case's status as IV–D or non-IV–D. It also firmly establishes that in both types of cases, the principal portion of past due child support is reduced before accrued interest. Because Roca paid his child support through the Centralized Support Registry, DHS rules controlled the method of allocation. Thus, it was error to utilize the United States Rule for allocating Roca's monthly payments.

---

13. DHS' policy on allocating interest payments remained unchanged with the 2013 amendments. *See* OAC 340:25–5–140.1(*l*) (eff. July 1, 2013)

("(*l*) **Application of payments to interest.** OCSS applies payments to interest per OAC 340:25–5–351").

### Conclusion

¶ 17 Title 43 O.S. Supp.2002 § 413 and DHS rules require payments made through the Centralized Support Registry in this case to be allocated first to current obligations, second to past due amounts, and finally to interest on the principle balance.[14] Accordingly, we vacate the COCA opinion and affirm the trial court's order of March 19, 2010.

¶ 18 REIF, V.C.J., KAUGER, WATT, WINCHESTER, EDMONDSON, TAYLOR, COMBS and GURICH, JJ., concur.

¶ 19 COLBERT, C.J., not participating.

**14.** Because we find Oklahoma statutes and DHS regulations dictate the outcome of this case, we need not address Roca's argument that applying different allocation rules to IV–D and non-IV-D cases would violate the Equal Protection Clause of the United States and Oklahoma Constitutions.