OSCN Found Document:ROCA v. ROCA

 
 
 
 OSCN navigation


 
 Home

 
 Courts

 
 Court Dockets

 
 Legal Research

 
 Calendar

 
 Help
 





 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 

 
 
 
 ROCA v. ROCA
2014 OK 55
Case Number: 108190
Decided: 06/24/2014
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2014 OK 55, __ P.3d __

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL 
RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

DEBBIE ROCA, Plaintiff-Appellant,
v.
CARLOS ROCA, 
Defendant-Appellee

CERTIORARI TO THE COURT OF CIVIL APPEALS, DIVISION IV, ON 
APPEAL FROM THE DISTRICT COURT OF TULSA COUNTY, STATE OF OKLAHOMA, HONORABLE 
DAWN MOODY

¶0 A judgment was entered against the defendant in the above-styled matter 
for child support arrearages. Defendant made payments on the unpaid child 
support until August 26, 2009, when he sought to terminate automatic payment via 
payroll deduction. The parties disagreed on how payments made against the child 
support arrearage should be credited. The trial court concluded that amounts 
paid against the judgment should be credited first to current child support; 
second to the principal arrearage; and finally to interest on past-due sums. The 
Court of Civil Appeals, Division IV, reversed, concluding payments should be 
applied in accordance with the United States Rule, offsetting interest before 
the principal balance. We granted certiorari to clarify the proper method of 
crediting payment against past due child support, and we determine that 
application of the United States Rule was improper.

COURT OF CIVIL APPEALS OPINION IS VACATED; AND THE 
TRIAL COURT'S MARCH 19, 2010 ORDER AFFIRMED

A. Craig Abrahamson, Tulsa, Oklahoma, for the Plaintiff/Appellant 
Debbie Roca
William D. Lunn, Tulsa, Oklahoma, for the 
Defendant/Appellee Carlos Roca


GURICH, J.
Facts & Procedural History
¶1 Debbie Roca, now Debbie Houston, and Carlos Roca were divorced by a 
consent decree entered on March 12, 1990. The decree of divorce included a child 
support computation which obligated Roca to pay the sum of $403.70 each month. 
After ten years of non-payment Houston cited Roca for contempt, alleging Roca 
had willfully failed to comply with the decree's child support mandates. A jury 
found the defendant guilty of indirect civil contempt, and he was sentenced to 
six months incarceration. Additionally, the trial judge imposed a judgment for 
past due child support in the amount of $85,392.77. In its September 13, 2000 
judgment, the trial court determined that the principal arrearage owed was 
$55,400.27. This sum was set as the purge amount. Additionally, the judgment 
imposed statutory interest on the principal arrearage at a rate of ten percent 
per year. Neither party appealed this ruling.
¶2 Following his incarceration, Roca paid $5,000 of the purge fee and was 
released from custody. The trial court conditioned Roca's release on his payment 
of $850.00 per month toward current and past due child support beginning October 
1, 2000.[1]
¶3 Roca made payments for approximately two years, and on April 16, 2003, the 
trial court entered an order establishing a reduced purge fee of $40,215.87. The 
parties also entered into an agreed order lowering Roca's monthly child support 
payment to $193.74 per month. This order became effective May 1, 2003. The trial 
court lowered the cumulative monthly payment for current and past due child 
support from $850.00 to $600.00. Additionally, the trial judge required all 
future payments to be posted through the Oklahoma Centralized Support 
Registry.[2] The 
Oklahoma Department of Human Services began administering child support 
collections for the Roca case in June of 2003. Roca made monthly payments of 
$600.00 between June 2003 and August 2009.[3] His current monthly child support 
obligation terminated at the end of May 2005, when the parties' child reached 
the age of majority.
¶4 On August 26, 2009, Roca filed a motion asking the district court to enter 
an order finding he had satisfied the principal child support arrearage; he 
further requested termination of the wage assignment. Roca later withdrew the 
motion and submitted a notice which asserted "all of his court-ordered child 
support payments" had been paid. The notice acknowledged owing some amount of 
accrued interest, but maintained that the remainder of his child support 
obligation had been paid in full. Spreadsheets included in the record reflected 
child support payments of $52,168.00 were made by Roca between June 2003 and 
August 2009.[4] 
Houston filed an objection, claiming for the first time that all of Roca's 
previous payments should have been applied in the following order: (1) current 
child support, (2) interest on the judgment, and finally (3) the principal 
arrearage. According to Houston's calculations, Roca still owed $84,147.26. On 
September 21, 2009, a default order was entered adopting the figures presented 
by Houston.[5] 
Roca sought to vacate the default order, and on November 10, 2009, the trial 
court sustained Roca's motion to vacate.
¶5 On March 19, 2010, the trial court entered a final order resolving the 
issues surrounding allocation of payments. After being presented with the 
respective pleadings on the issue, and arguments from both parties, the trial 
judge determined: (1) payments applied against the judgment rendered July 11, 
2000, should be credited first to current support (including medical expenses 
and child care), second to unpaid child support arrearages, and third to 
interest; (2) Roca's current child support obligation terminated at the end of 
May 2005, when the parties' child reached majority; (3) Roca had paid all sums 
owed for current and past due child support, excluding interest on the 
obligation; (4) Roca's remaining obligation was $54,818.77, representing unpaid 
interest on the child support obligations; (5) $54,818.77 should be set as the 
new purge fee; and (6) the remaining unpaid liability should not accrue further 
amounts of interest.
¶6 Houston appealed the lower court's ruling and COCA reversed. COCA 
concluded that the facts of this case required application of the common law 
rule also known as the United States Rule. By applying the United States Rule, 
COCA found that Roca's payments should be credited first to current child 
support, second to accrued interest, and last to the principal balance of 
past-due child support. Roca sought review in this Court, and we granted 
certiorari to resolve this question of first impression.
Standard of Review
¶7 Whether monthly payments covering current child support, past-due child 
support, and accumulated interest should be allocated by applying the United 
States Rule is solely a legal issue for this Court to resolve. See 
generally Phillips v. Hedges, 2005 OK 77, ¶ 8, 124 P.3d 227, 230-231. Questions of 
law mandate application of the de novo standard of review, affording this Court 
with plenary, independent, and non-deferential authority to examine the issues 
presented. Harmon v. Cradduck, 2012 OK 80, ¶ 10, 286 P.3d 643, 648.
Analysis
¶8 The sole issue presented in this case is how payments should be allocated 
between current child support, accumulated arrearages, and interest on past due 
amounts. COCA concluded this question was controlled by the United States Rule, 
thereby requiring Roca's payments applied first to current child support; 
second, to interest on past due child support; and finally to the principal 
balance of child support arrearages. Because we find Oklahoma statutes and DHS 
rules provide the method of allocating and distributing payments in this case, 
we reverse and hold that the United States Rule does not control this 
proceeding.
¶9 Deriving from common law, the United States Rule requires "partial 
payments of a debt be applied first to unpaid interest due and thereafter to the 
principal debt." 28 Williston on Contracts § 72:20 (4th ed.). Its purpose is to 
encourage full and prompt payment of indebtedness. Id. While the policy 
rationale behind application of the United States Rule to consumer loans or 
civil money judgments is sound, we believe COCA erroneously applied it to this 
child support proceeding. We have previously condoned use of the United States 
Rule for purposes of allocating payments toward ordinary civil money judgments. 
Landess v. State ex rel. Comm'rs of Land Office, 1958 OK 295, ¶¶ 10-11, 335 P.2d 1077, 1079. However, we 
have never been called upon to decide the Rule's application to a judgment 
procured from unpaid child support.
¶10 There are significant differences between a child support debt and a 
civil money judgment which require application of distinct allocation principles 
for payments toward the child support obligations in this case. Oklahoma's 
legislature has adopted specialized enforcement mechanisms to aid in the 
collection of child support, as required by Title IV, Part D, of the Federal 
Social Security Act, as amended, 42 U.S.C., § 651 et seq.[6] These tools include, but are 
not limited to, revocation or non-issuance of a driver's or professional license 
(43 O.S. 2011 § 139.1); 
incarceration or fine for indirect contempt of court (21 O.S. 2011 § 566); imposition of a 
statutory lien against real or personal property (43 O.S. 2011 § 135); interception of 
the obligor's tax refund (68 O.S. 
2011 § 205.2); court ordered bond or other security to ensure compliance 
with a child support order (43 O.S. 
2011 § 116); felony prosecution for nonpayment of child support (21 O.S. 2011 § 852); and statutory 
interest of ten percent per annum (43 
O.S.Supp. 2012 § 114). Each of the aforementioned statutes are designed to 
facilitate payment of child support and are inapplicable to ordinary money 
judgments. Child support in this state is controlled by statute; therefore it is 
unnecessary rely on the common law to assess an obligor's liability.
¶11 The unique aspect of a child support collection case sets it apart from 
actions involving an ordinary civil money judgment. The Supreme Court of West 
Virginia explained this contrast in a similar case:

 
 [C]hild support payments are a legal duty rather than a debt. 
 Additionally, [Bureau of Child Support Enforcement] maintains that the 
 Legislature's recognition of the fundamental difference between support 
 orders and money judgments in the enactment of remedies conforming with 
 federal requirements for collection of child support . . . are significantly 
 different from those available for collection of routine money judgments. 
 The statutes governing interest on support also stand apart from those 
 relating to money judgments.
Hornbeck v. Caplinger, 712 S.E.2d 779, 783 (W. Va. 2011) (citation 
omitted). The Hornbeck Court was presented with a legal scenario 
comparable to the one we are asked to decide. Id. at 782. In determining 
how payments toward a child support judgment should be credited, the court 
weighed administrative rules promulgated by the state's child support 
enforcement agency. Id. at 785-786. Those regulations required payment of 
sums in excess of current child support obligations to be applied to principal 
rather than interest. Id. Affirming application of these rules, the West 
Virginia Supreme Court noted the policy rationale behind this method of 
allocating payments on child support judgments:

 
 BCSE maintains that this procedure is in keeping with the legislative 
 intent that parents have a most serious obligation to provide for the 
 support of the needs of their children. Applying excess payments to child 
 support principal in arrears merely carries out this priority by providing 
 that any available assets go toward tending to the needs of a child over and 
 above payment of interest which would benefit someone other than the 
 child.
Id. at 785.
¶12 Like West Virginia, Oklahoma has enacted specific statutes which deal 
with child support obligations. Furthermore, our Legislature has expressly 
vested DHS, as the state's child support enforcement agency, with the authority 
to promulgate rules necessary to carry out the requirements imposed by federal 
law. See 56 O.S. 2011 § 
237(B)(2). In 2000, the Oklahoma Legislature amended 43 O.S. Supp. 2000 § 413 (eff. Nov. 
1, 2000), adding subsection (F), which read: "[a]ll payments made through the 
[Centralized Support] Registry shall be 
allocated and distributed in accordance with Department of Human 
Services policy and federal regulations."[7] (emphasis added). Utilizing its 
statutory authority, DHS implemented rules which govern the allocation and 
distribution of child support payments. Because the record indicates Roca began 
making his payments through the Centralized Support Registry in June of 2003, § 
413 required those payments to be accounted for in conformity with DHS policy 
and federal rules.[8]
¶13 At the time Roca began paying child support through the Registry, DHS 
regulations contained several sections which addressed allocation and 
distribution of payments received. First, OAC 340:25-5-351 (2003 Supp.) provided 
that DHS administered support payments "received by the Centralized Support 
Registry for IV-D and non-IV-D cases." According to definitions set forth in the 
rules, a non-IV-D case was defined as a private child support case not receiving 
IV-D services. See OAC 340:25-1-1.1 (2003 Supp.) On the other hand, a 
IV-D case was one involving benefits paid under Title IV, Part D, of the Social 
Security Act[9]. 
Id.
¶14 After all current child support was paid, the 2003 version of agency 
rules required DHS to apply "collections under payment plans to fixed monthly 
past-due support obligations." OAC 340:25-5-351(d).[10] Additionally, payments to interest 
were controlled by OAC 340:25-5-140.1, which read in part: "(h) CSED applies 
payments to interest after current support and all arrears have 
been paid in full."[11] (emphasis added). OAC 340:25-5-140.1 contained no 
limitation on its application, and appears equally relevant to both IV-D and 
non-IV-D cases. On the other hand, the rules also contain conflicting language, 
suggesting that in non-IV-D cases with only one family support obligation, 
"OKDHS pays collections directly to the family without allocating collections to 
the various types of support obligations."[12] OAC 340:25-5-351(b)(2). To compound 
the apparent discord, DHS amended their allocation and distribution rules 
multiple times between 2003 and 2009. These inconsistencies require us to employ 
rules of construction to determine the objectives of DHS' administrative rules. 
Charlson v. State ex rel. Dept. of Public Safety, 2005 OK 83, ¶ 10, 125 P.3d 672, 675. Amendments to 
statutes or administrative rules may be used by this Court for the purposes of 
discerning ambiguities in the original enactment. See Polymer 
Fabricating, Inc. v. Emp'rs Workers' Comp. Ass'n, 1998 OK 113, ¶ 15, 980 P.2d 109, 114 (giving 
retrospective effect to legislative amendments intended to clarify uncertainties 
in prior version of statute).
¶15 In 2013, DHS amended its rules to clarify agency protocol for allocation 
and distribution in IV-D and non-IV-D cases. The current version of OAC 
340:25-5-351 (eff. July 1, 2013), now provides in part:

 
 Allocation and distribution of collections
 ..
 (c) Allocation.
 (1) In general. Allocation refers to how a payment will be divided among 
 obligations. Some obligors have more than one child support case and the 
 rules of allocation determine which case receives all or a portion of the 
 collection received. A collection is allocated based on the source of the 
 collection and the type of legal action resulting in a collection.
 (2) Allocation models. OCSS divides collections among the obligor's 
 eligible obligations based on the following models:
 (A) Standard Model. All payments not made by income withholding order or 
 federal income tax refund offset are allocated to eligible obligations in 
 the following sequence:
 (i) prorated to the current child support, cash medical 
 support, and spousal support;
 (ii) prorated to the monthly payment plan on past support; 
 and
 (iii) amounts remaining from the initial collection or additional 
 collections received during the same month will allocate based on a prorated 
 share of total arrears owed on all eligible obligations. The allocated 
 amounts cannot exceed the total arrears due on the cases.
 (B) Income Withholding (IWO) Model. Periodic payments from an income 
 withholding order are allocated to eligible obligations in the following 
 sequence:
 (i) prorated to the current child support, cash medical 
 support, and spousal support;
 (ii) prorated to the monthly payment plan on past support 
 and other judgment(s), such as judgments for attorney fees or genetic 
 testing costs; and
 (iii) the steps in (1) and (2) of this subsection are repeated for 
 amounts remaining from the initial collection or additional collections 
 received during the same month, until the entire collection is 
allocated.
 ..
 (4) Non-Title IV-D cases. In non-Title IV-D cases, OCSS allocates 
 payments as follows:
 (A) payments received from an income withholding order are allocated 
 using the IWO Model above. Collections are allocated to non-Title IV-D cases 
 based on the amounts listed in the non-Title IV-D IWO;
 (B) all other payments are allocated using the Standard Model above. When 
 OCSS receives information on processing a specific payment, OCSS may 
 allocate the payment based on that information.
 d) Distribution.
 ..
 (5) OCSS distributes payments to interest owed after the current 
 child support and principal arrears balances are paid in full to 
 each obligation. (emphasis added).[13]
¶16 The amended version of OAC 340:25-5-351 leaves no doubt that DHS 
allocates payments uniformly, regardless of a case's status as IV-D or non-IV-D. 
It also firmly establishes that in both types of cases, the principal portion of 
past due child support is reduced before accrued interest. Because Roca paid his 
child support through the Centralized Support Registry, DHS rules controlled the 
method of allocation. Thus, it was error to utilize the United States Rule for 
allocating Roca's monthly payments.
Conclusion
¶17 Title 43 O.S. Supp. 2002 § 
413 and DHS rules require payments made through the Centralized Support 
Registry in this case to be allocated first to current obligations, second to 
past due amounts, and finally to interest on the principle balance.[14] 
Accordingly, we vacate the COCA opinion and affirm the trial court's order of 
March 19, 2010.

¶18 Reif, V.C.J., Kauger, Watt, Winchester, Edmondson, Taylor, Combs and 
Gurich, JJ., concur.
¶19 Colbert, C.J., not participating.

FOOTNOTES

[1] 
Although there is no order in the record which delineates how payments were to 
be allocated under this order, pleadings filed by Houston acknowledge the 
$850.00 sum was payable as the "purge fee." Motion to Accelerate Sentence, O.R. 
at 5.

[2] 
See 43 O.S. 2011 § 
413.

[3] The 
record reflects that Roca also made two lump sum payments of $2,600.00 and 
$5,600.00 in June and July of 2003.

[4] 
Attached to Roca's Motion to Terminate Garnishment was a DHS spreadsheet 
reflecting the total payments received through the Oklahoma Centralized Support 
Registry between June 2003 and August 2009.

[5] 
Therein, the trial judge concluded the principal balance owed was still 
$59,300.45, with accumulated interest of $24,846.81 through September 1, 2009, 
creating a total judgment of $84,147.26. Roca alleged that the default order was 
entered following confusion over whether the hearing on his motion to terminate 
the wage assignment had been cancelled. As noted, Roca filed a pleading 
subsequent to his motion, styled "Defendant's Notice of Payment of Purge Fee and 
Withdrawal of Motion to Terminate Garnishment." In spite of Roca's withdrawal of 
the pending motion, Houston's attorney appeared at the scheduled hearing and 
secured judgment by default. Houston denied that the hearing was stricken or 
rendered moot by the filing of the purported notice and withdrawal.

[6] In an 
effort to address increasing dependence on federal social services created by 
unpaid child support obligations, Congress passed legislation in the mid-1970s 
requiring each state to develop their own child support enforcement program. 
Laura W. Morgan, The Federalization Of Child Support A Shift In The Ruling 
Paradigm: Child Support As Outside The Contours Of "Family Law," 16 J. Am. 
Acad. Matrim. Law. 195, 203; Paul K. Legler, The Coming Revolution in Child 
Support Policy: Implications of the 1996 Welfare Act, 30 Fam., L.Q. 519, 521 
(1996). Commonly referred to as a "IV-D" program, these state organizations 
consisted of a joint state and federal enforcement system. Numerous amendments 
were made to the original enactment, perhaps none more significant than the 
Personal Responsibility and Work Opportunity Reconciliation Act of 1996 
(PRWORA). The PRWORA ended the federal government's direct involvement with 
welfare administration and replaced it with a system of block grants to states 
complying with IV-D program requirements. Id. In the area of child 
support enforcement, the PRWORA compelled changes in state laws and procedures 
to enhance collections of support. Id. One such requirement was the 
creation of a central support registry. Id.

[7] This 
section remains identical; however, it is now codified at 43 O.S. 2011 § 413(G).

[8] Federal 
regulations only address allocation of payments in IV-D cases. 45 C.F.R. § 
302.51, reads in relevant part:
(a)(1) For purposes of distribution in a IV-D case, amounts collected, 
except as provided under paragraphs (a)(3) and (5) of this section, shall be 
treated first as payment on the required support obligation for the month in 
which the support was collected and if any amounts are collected which are in 
excess of such amount, these excess amounts shall be treated as amounts which 
represent payment on the required support obligation for previous months. 
(emphasis added).

[9] There 
is nothing in the record to suggest IV-D services were being received by Houston 
on behalf of the minor child.

[10] 
According to 56 O.S. 2001 § 
237.7(20) "'Payment plan' includes, but is not limited to, a plan approved 
by the support enforcement entity that provides sufficient security to ensure 
compliance with a support order or that incorporates voluntary or involuntary 
income assignment or a similar plan for periodic payment of past-due support 
and, if applicable, current and future support. . ." Roca was undoubtedly paying 
the 2000 child support judgment via a payment plan as defined by 
statute.

[11] 
See OAC 340:25-5-351 (b)(5).

[12] DHS 
regulations defined support as "all payments or other obligations due and owing 
to the obligee or person entitled by the obligor under a support order, and may 
include, but is not limited to, child support, medical insurance or other health 
benefit plan premiums or payments, child care obligations, support alimony 
payments, and other obligations as specified in Section 118 of Title 43 of the 
Oklahoma Statutes." See OAC 340:25-1-1.1. It is unclear from the record 
in this case, whether DHS merely provided a conduit for transferring payments to 
Houston or whether the agency employed consistent allocation policies for both 
IV-D and non-IV-D cases.

[13] 
DHS' policy on allocating interest payments remained unchanged with the 2013 
amendments. See OAC 340:25-5-140.1(l) (eff. July 1, 2013) ("(l) 
Application of payments to interest. OCSS applies payments to interest 
per OAC 340:25-5-351").

[14] 
Because we find Oklahoma statutes and DHS regulations dictate the outcome of 
this case, we need not address Roca's argument that applying different 
allocation rules to IV-D and non-IV-D cases would violate the Equal Protection 
Clause of the United States and Oklahoma 
Constitutions.




 Citationizer© Summary of Documents Citing This Document
Cite
 Name
 Level
 None Found.
Citationizer: Table of Authority
Cite
 Name
 Level
 Oklahoma Supreme Court Cases Cite
Name
Level 1958 OK 295, 335 P.2d 1077, LANDESS v. STATE
Discussed 2005 OK 77, 124 P.3d 227, PHILLIPS v. HEDGES
Discussed 2005 OK 83, 125 P.3d 672, CHARLSON v. STATE ex rel. DEPT. OF PUBLIC SAFETY
Discussed 2012 OK 80, 286 P.3d 643, HARMON v. CRADDUCK
Discussed 1998 OK 113, 980 P.2d 109, 69 OBJ 4068, Polymer Fabricating, Inc. v. Employers Workers' Compensation Association
Discussed
Title 21. Crimes and Punishments Cite
Name
Level 21 O.S. 566, Punishment for Contempt - Failure to Comply Child Support and Other Orders
Cited 21 O.S. 852, Omission to Provide for a Child - Penalties - Venue for Prosecutions
Cited
Title 43. Marriage Cite
Name
Level 43 O.S. 139.1, Revocation, Suspension, Nonissuance or Nonrenewal of License for Noncompliance With Support Order
Cited 43 O.S. 114, Interest on Past-Due Child Support Payments, Suit Moneys Payments, and Judgments for Support
Cited 43 O.S. 116, Security or Bond for Payment of Child Support
Cited 43 O.S. 135, Lien for Child Support Arrearages - Notice and Hearing
Cited 43 O.S. 413, Payments Made Through Registry - Procedure - Change of Address - Service of Process
Discussed at Length
Title 56. Poor Persons Cite
Name
Level 56 O.S. 237, Support Collection, Parent Location, and Paternity Determination Services
Cited 56 O.S. 237.7, Definitions
Cited
Title 68. Revenue and Taxation Cite
Name
Level 68 O.S. 205.2, Claim Requesting Deduction - Hearing - Notice - Priority - Rules, Regulations and Procedures
Cited